[No. 1566. Decided March 25, 1895.]

## THE STATE OF WASHINGTON, *Respondent*, v. NEWEL S. BARR, *Appellant*.

HOMICIDE — SETTING SPRING GUN — QUESTION OF FACT FOR JURY — SUFFICIENCY OF INFORMATION — EVIDENCE OF CHARACTER.

The reasonable necessity of employing spring guns and other defensive machinery for the protection of property, which has resulted in the death of a trespasser, is a question of fact which should be left to the jury.

Upon a prosecution for murder, death having resulted from the discharge of a heavily loaded spring gun, caused by pushing open

31 —11 WASH.

the door of a dwelling house, the defendant is not entitled to an instruction that he had an absolute right to set the gun as he did, when there was no one in the dwelling whose life could have been endangered by any burglary committed thereon.

A verdict of murder in the second degree is warranted when the evidence shows that defendant, on absenting himself from his cabin for several months, loaded a spring gun with a double charge of powder and shot, together with a rifle cartridge and set the gun with the muzzle close to the door so that any one pushing the door open would discharge the gun and cause his death.

An information charging defendant with having purposely killed the deceased is sufficient when the proofs show a general intent to kill without any intention of killing a particular person.

Evidence tending to show the good reputation of defendant should be confined to a time not too remote from the date of the commission of the crime.

*Appeal from Superior Court, Whatcom County.*

*E. P. Dole,* for appellant:

A person has a right to set a gun to protect his home from burglars during his absence. Wood, Nuisances (2d ed.), 147; *State v. Moore,* 31 Conn. 479 (83 Am. Dec. 159); Cooley, Torts (2d ed.), 194; 2 Wharton, Crim. Law, § 1025, 1019, *a*; *Gray v. Combs,* 7 J. J. Marsh. 478; *Ilott v. Wilkes,* 3 Barn. & Ald. 304.

*Thomas G. Newman,* Prosecuting Attorney, and *C. W. Howard,* for The State:

In this country it is well settled that a man may not set spring guns for the protection of his property against trespassers. Kerr, Homicide, §§ 180, 184–186; 9 Am. & Eng. Enc. Law, pp. 586, 606; *State v. Patterson,* 45 Vt. 308 (12 Am. Rep. 208); *Carroll v. State,* 23 Ala. 28 (58 Am. Dec. 284); *Simpson v. State,* 59 Ala. 1 (31 Am. Rep. 9); *Johnson v. Patterson,* 14 Conn. 1 (35 Am. Dec. 100); *State v. Morgan,* 38 Am. Dec. 718; *Brown v. State,* 18 S. W. 1053; *Noles v. State,* 62 Am. Dec. 713; *People v. Walsh,* 43 Cal. 447.

The opinion of the court was delivered by

HOYT, C. J.—Defendant was convicted of the crime of murder in the second degree, and from the judgment and sentence imposed prosecutes this appeal. The circumstances connected with the homicide were substantially as follows:

Defendant and one Walter Pixley, a boy of seventeen years of age, occupied a cabin together. The cabin belonged to the defendant, but the land upon which it was situated was the property of the Bellingham Bay Improvement Company. The cabin was a small building, about ten by fourteen feet in dimensions, constructed of boards one inch in thickness placed up and down and battened with shingles. There was one door and a single window. The lock on the door fitted so loosely that the door could be pushed open with little force without unlocking it. About December 8, 1893, defendant and Pixley went into the mountains for a hunting trip, intending to be gone most of the winter. On the morning they left, defendant placed a spring gun inside the cabin. It was loaded with a double charge of powder and shot, and in addition thereto a loaded Winchester rifle 45-90 cartridge was placed therein, on top of the shot and powder. It was aimed directly at the casing of the door, in such a way that a person of ordinary height standing in front of the door and placing his hand on the knob would, upon pushing the door open a few inches, receive the entire charge in his body. The window and door were then nailed up, the door being first locked with the insecure lock above referred to. The boards were placed up and down over the door, and fasted by nails driven through a one-inch board. Before the cabin was so fastened up, some of the best of its contents were removed to the house

of a neighbor, and those remaining were but of little value. On the day of the homicide and the preceding day, deceased, with three companions, had made several trips to a construction camp a little further from the business part of Whatcom than this cabin, for the purpose of securing work upon a road in process of construction. On the morning of the day of the homicide they took their blankets and started for said camp, but not having completed arrangements for getting work, they thought best not to carry their blankets all of the way, and left them in a tree or stump a short distance from this cabin. After arriving at the camp they found it would be necessary to return to town to find the man they wished to see. Having done so, they found this man, and completed arrangements under which they were to go to work on the road. Thereafter two of them, deceased and one Nels Anderson, after purchasing a loaf of bread and some bologna sausage, upon which to make a supper, started to walk to camp. It was then dark, the road was rough and muddy, and it was raining. When they came near the cabin which they had passed before, and which was boarded up and apparently unoccupied, the deceased stated that he did not think anybody had lived in it for a long while; that he would see if they could not get in, and, if they could, they had better get their blankets and sleep there instead of going on to camp. In attempting to make an entrance through the door, secured as before stated, the spring gun was discharged, and the entire charge penetrated the casing of the door and passed entirely through the body of the deceased, killing him instantly.

There is some testimony as to statements made by the defendant tending to show what his intentions were in setting the spring gun. Such testimony is

more or less conflicting, and the determination of what
was proved thereby was properly left to the jury; and
to our minds it appears from a fair preponderance of
such testimony that the statements made by the de-
fendant were not such as would have been likely to
have been made by one who had no other motive than
to protect his cabin and the property therein by such
means as could be made use of without wanton disre-
gard for the lives of his fellowmen. But whether or
not this was so is in our opinion immaterial in the de-
termination of the questions presented on this appeal.
There was also testimony tending to show that after the
door had been nailed up, a placard bearing the word
"danger" was posted on the outside of the boards
nailed over the door. But whether or not this was so
is also immaterial.

The principal contention of the defendant was that
in setting the gun as above stated he only did what he
had an absolute right to do, and he asked the court so
to instruct the jury, and now assigns as error its re-
fusal so to do, which assignment of error, if sustained,
will result in the reversal of the judgment and sentence
and the discharge of the defendant.

If the question as to what the defendant had a right
to do by way of providing for the defense of the cabin
and property contained therein were one of law un-
mixed with any question of fact, there might be force
in this claim, but in our opinion it is not. It is no
doubt true that in the old English cases, and perhaps
in some of the earlier cases in this country, this ques-
tion was passed upon by the courts as one of law, but
in our opinion, in so deciding this question such
courts made a mistake which has led to most of the
trouble connected with the proper determination of
this and kindred questions. The relation of the Eng-

lish cases to this question is so well stated by the learned judge who wrote the opinion in the case of *Aldrich v. Wright*, 53 N. H. 398 (16 Am. Rep. 339), that we quote therefrom:

"On the subject of defending a man's property in his absence, by spring guns, man traps, or other engines calculated to destroy human life or inflict grievous bodily harm, the English courts turned a question of fact into a question of law, and were not successful in their efforts to prescribe adequate rules for determining the reasonable necessity of such engines under the varying circumstances of different cases.

This error of the courts, and the trouble and uncertainty arising therefrom, resulted in the regulation of this matter in England by statute, the enactment of which was necessary and proper under the circumstances but would have been unnecessary if the courts had treated this question as one of fact, and left it to the jury to decide under proper instructions in the light of the facts of each particular case. If the reasonable necessity of employing defensive machinery of all kinds had been left to the jury, as such a question of fact should have been, this judicial and legislative trouble would have been avoided and the general principles of the common law would have been amply sufficient to protect the rights of all concerned. The result in England of holding this to be a question of law instead of one of fact furnishes a good reason for the courts of this country adopting a different rule. Those of several of the states have done so while those of others have adhered to the rule laid down in England. By this decision we hope to place this court in a line with those of the former class; for the reasons above suggested, and for many others which might be given.

It is a universal principle that neither in defense of person nor property can one go further than is reason-

ably necessary for that purpose, and this single prin-ple followed to a logical conclusion will establish the proposition that whether or not that was done in a particular case was justified under the law must be a question of fact, or mixed law and fact, and not a pure question of law. It follows that the contention of the defendant that the court should have taken this ques-tion from the jury and decided it itself cannot be sus-tained, and since for that reason it was properly sub-mitted to the jury under. what seems to us to have been proper instructions, we could content ourselves with what we have said as sufficient to require us to find against the above stated contention of the defend-ant, but owing to the importance of the question, and the fact that it is claimed that there was some tech-nical error connected with the instructions, we feel called upon to make some brief additional observations. It was the settled law in England that means which might reasonably be expected to cause death could not be made use of to prevent other crimes than those classed as felonies. But it was held that to prevent felonious crimes such means might be made use of, and this same distinction has been adopted by many of the courts of this country, but without any good reason existing therefor. The reason why the use of such means was allowed to prevent crimes of that kind in England was that they were there punishable by death. This being so, there was reason for the rule. If one was about to perpetrate a crime for which under the law his life would be forfeited, there was reason in holding that his life might be taken if necessary to pre-vent his committing it. But in this country few crimes subject the ones who have committed them to the death penalty, and it is only as to those which do that the reason of the rule has any force. What were

felonies at common law usually subject the offender here to comparatively light punishment, and upon principle it should be here held that one could only properly make use of means which might be expected to cause death to prevent the commission of a capital offense.

We are aware that courts of high standing have come to a contrary conclusion, and have held that such means might be made use of to prevent the commission of some felonies, especially to prevent the crime of burglary; but it seems to us that in so doing they have lost sight of the changed conditions of things in this country, and have adhered to the English rule when the reason therefor has no existence. The crime of burglary has been so much extended by the statutes of this state that, excepting in the case of burglary of a dwelling house when occupied by the owner or some member of his family, there is no reason why more extreme means should be allowed for its prevention than to prevent other felonies. As to what may properly be done to prevent the burglary of a dwelling house when occupied is another question. There it is not simply the damage to the property which may result from the burglary, or the sanctity connected with the property when so protected that it can only be reached by the commission of a burglary that is involved, but in addition thereto is the question of the risk to the lives of the inmates. It is common knowledge that burglaries under such circumstances often result in the death of some of the inmates of the dwelling upon which the burglary is committed, and for that reason it might well be held that a burglary of that kind could rightfully be prevented by such means as might result in death.

Applying the principles which will naturally arise

from the above suggestions to the conceded facts in the case at bar, it must result that not only was the defendant not entitled to the instruction asked for, but that on the contrary, the court might have been justified in holding that the defendant did that which he had no right to do. The undisputed facts showed that there was no person in this cabin whose life could have been endangered by a burglary committed thereon, hence if what we have said is correct, it might not be prevented by means which might be expected to destroy the life of a human being. That the means used were of that kind is evident, whether judged by what might reasonably have been expected to have been the result, or by the result itself.

It is not necessary, however, to go to the extent above suggested in order to sustain the ruling of the trial court. Even if it should be assumed that the defendant had a right to protect his cabin by setting a gun to defend the same, such right would still be subject to the universal rule that only such means as are reasonably necessary to prevent the crime should be made use of, and the undisputed facts abundantly warranted the jury in coming to the conclusion that more than the prevention of the burglary of the cabin was intended by the defendant in loading and setting the gun as he did. The extreme charge of both powder and shot, and the addition of such a terrible missile as an entire rifle cartridge, in a gun so placed that it would hit one but a few feet from the muzzle, furnished abundant reason for the jury to find that a vindictive desire to take the life of whomever should interfere with the cabin, rather than the prevention of the commission of a crime therein was the object sought by the defendant.

Authorities might be given upon this proposition,

but on account of the confusion and want of harmony
among the cases, growing in part at least out of the
reasons above suggested, their citation would be of lit-
tle use.    In our opinion the court committed no error
in refusing the instruction asked, for the reason that
the question to be decided was one of fact, or mixed
fact and law, and therefore for the jury; and for the fur-
ther reason that under the undisputed facts any proper
interpretation of the law applied thereto would have
warranted the court in instructing the jury that the
defendant had no right to protect his property by the
means used.

Some other reasons for reversal have been urged in
behalf of the defendant.    If considered as founded
upon each separate exception taken during the prog-
ress of the trial, as they seem to be by the manner of
their statement in the brief of appellant, their exam-
ination would prolong this opinion into a treatise upon
criminal law.    We shall content ourselves with con-
sidering two propositions which cover most of the ex-
ceptions taken, and with a statement that we have
carefully considered the others and find in regard
thereto that the rulings excepted to deprived the de-
fendant of no substantial right.

The questions which it is necessary to briefly discuss
are:    First, as to the sufficiency of the information;
and second, as to the proofs introduced and offered as
to the character of the defendant.    In the information
the defendant is charged with having purposely killed
the deceased, and since the proofs showed that he
could have had no intention to kill any particular per-
son it is claimed that the information was insufficient,
or if sufficient was not supported by the proofs.  In
our opinion the statement in the information as to the
intent to kill the particular person would have been

sufficient in an indictment at common law and would have been supported by proof of having done an act with intent to kill another person than the deceased, which resulted in the death of the person whom it was charged he intended to kill.   But it is contended that our statute, which requires the facts to be stated in the information controls, and that even although this information would have been good at common law it was not good under our statute for the reason that the facts were not correctly stated therein.   The information was proof against this attack for two reasons: First, that the facts were substantially stated,—the general intent to kill became special when the means made use of had taken effect on a particular person; and secondly, our statute as to informations, when invoked, must be taken as a whole, and when so taken an information is good thereunder against an attack of this kind unless it were possible that the defendant could in some manner have been misled thereby to his injury.   And it is evident that this defendant could not have been so misled by the statement that he intended to kill the deceased, when the facts were that he had a general intent to kill, which resulted in the death of the deceased.

The other question above suggested arises upon the action of the court in refusing to allow a witness to testify as to the reputation of the defendant from his boyhood days to the time of the homicide.   Upon this question the court allowed the defendant to introduce proof covering all the latter years of his life, and some that went further back.   This being so, the rights of the defendant were not infringed, for while it is true, as suggested by counsel for defendant, that even boyhood reputation might in some degree affect his probable action at the time of the homicide, a due con-

sideration of the rule that testimony must not be too remote will justify the action of the court. If a defendant puts in evidence as to good character, it is competent for the prosecution to show bad character, and in order that this right of the prosecution may be made effective it is necessary that the evidence on the part of the defendant should be confined to a time not too remote from the date of the commission of the crime. It would be impracticable for the prosecution in most cases to trace the life and habits of a defendant for more than a few years, and to allow him to go back to boyhood and put in proof which it would be out of the power of the prosecution to contradict, or in any manner rebut, however false it might be, would result in an advantage to the defendant which the rule in question never contemplated.

The case seems to have been tried carefully, and in such a manner as to protect every substantial right of the defendant. The judgment and sentence will be affirmed.

ANDERS, GORDON, DUNBAR and SCOTT, JJ., concur.