THE STATE OF IOWA V. RICHARD WILLIAMS, Appellant,

Murder: EVIDENCE: COLLATERAL MATTER. On a criminal prosecution, the state is bound by the answers of a witness on cross-examination where the inquiry relates to a collateral matter. Evidence examined and held to constitute an inquiry into a collateral matter and while the character of the evidence might not require a reversal, .yet in view of the use made of it, the error in admitting the same ·was prejudicial.

Misconduct of Counsel. It is error for a prosecuting attorney to state in argument that defendant has the right to offer evidence of good character, and that his failure so to do is evidence of bad character, or to comment· upon matters unsupported by any evidence.

Self-Defense. INSTRUCTIONS. Where the issue of self-defense is submitted, it is error to refuse to instruct that the state has the burden of showing beyond a reasonable doubt that defendant was not acting in self-defense.

Murder: DRUNKENNESS: INSTRUCTION. Drunkenness should be considered not only in its bearing upon. the question of intent, but, where murder in the first degree is charged, upon the question of willfulness, premeditation and deliberation also, and failure to so instruct, is error.

Same. On a prosecution for murder in the first degree, where intoxication is a defense, the jury should be instructed that if defendant was so intoxicated as to be incapable of forming an intent to do the act, he was not guilty; and further, that his intoxicated condition should be considered as bearing on the degree of the crime.

Murder: DETERMINATION OF GUILT. Where defendant killed deceased in the attempt to shoot another concealed behind deceased, his guilt or innocence may be determined from the same conditions as would govern had he killed the one intended.

*Appeal from Mahaska District Court.*—HON. A. R. DEWEY, Judge.

WEDNESDAY, JANUARY 13, 1904.

DEFENDANT was indicted, tried, and convicted of the crime of murder in the first degree, and his punishment was fixed as death. From the judgment on the verdict defendant appeals.—*Reversed.*

*Woodson & Brown* and *McCoy & McCoy* for appellant.

*Chas. W. Mullan,* Attorney General, *Chas. A. Van Vleck,* Assistant Attorney General, and *James A. Devitt,* County Attorney, for the State.

DEEMER, C. J.—Defendant is a negro. On the afternoon of Sunday, December 8, 1901, he, with several colored men and four white men, were in a saloon conducted by one Gaines, in or near the town of Buxton, in Mahaska county. All were drinking, and more or less intoxicated. One McCully, who was considerably under the influence of liquor, made the remark in the presence of the others that his brother had the fastest trotting horse in the state. Defendant said in response that he had a couple of trotters which he would bet a dollar could outtrot him. Mc-Cully replied that his brother's horse could outtrot them. To this defendant drew a dollar from his pocket, and said, "Here is a dollar that says that he don't." Sharper, the deceased, was standing a little apart from these men, and one Cooper was standing near McCully, trying to induce him to go home. When defendant produced his money with the declaration before quoted, Cooper turned to Mc-Cully, and said, "Take your money, Bill, and let us go." Cooper continued his offer of the dollar to McCully, who said that it was not his, and that he did not want it. At this Cooper laid the money down, and said, "Excuse me, I did not want the money any way.," and asked the pardon

of both, saying "that he was not looking for trouble."
On hearing this, defendant walked around to where
Cooper was standing, and said, "If a fight is what you are
looking for, you can get it." Cooper replied that, "We
are not looking for a fight." Sharper, the deceased, inter-
posed the remark, "No, we are not fighters," "Come,
we do not want trouble." By this time the defendant had
backed Cooper up against the bar which was in the room,
and while standing in front of him said, "If you don't put
up that knife, I will bust your heart;" accompanying the
remark with the production of a revolver. Another of
the men standing near, on seeing the revolver, said they
did not want to fight, and did not want to have any
trouble, whereupon the defendant pointed the revolver at
Cooper, whom he had charged with having a knife.
Cooper began to dodge and to duck behind McCully, at the
same time putting up his hand, and declaring that he had
no knife. Defendant continued to follow Cooper with his
revolver, and he (Cooper) dodged from behind McCully to
a position behind the deceased, Sharper. At the moment
that he got behind Sharper, the accused fired a shot, in-
flicting a fatal wound upon Sharper, from which he died
almost instantly. Defendant then left the building,
untied his team, which was standing near, got into the
buggy, and started toward the town of Albia, some seven
or eight miles distant. He was next found by the road-
side about a mile from Albia, and when accosted said he
was sick, and that he had fallen out of his buggy. He
finally walked into the town of Albia, boarded a night
train, and went to Ottumwa, at which place he was ar-
rested on December the 10th. Evidence was adduced tend-
ing to show that defendant was drunk at the time of the
homicide, and claim was made at the trial that whatever he
did was in defense of his person. Many errors are assigned,
some of which need not be considered in view of the final
disposition made of the case.

I. A witness, Lee, who testified that he was with the defendant both before and after he entered the saloon, and that he had been drinking heavily before the homicide, was asked the following questions, to which he gave answers as shown: "Q. Did you cross the lots of a woman by the name of Fisher that day? (Objected to by defendant as not proper cross-examination. Overruled, and defendant excepts.) A. I don't know where that is. Q. Did you see Williams have his revolver out after you drank the two bottles of beer and before you got to Gaines' restaurant? (Objected to by defendant; not proper cross-examination, incompetent, irrelevant, and immaterial. Overruled, and defendant excepts.) A. I never saw him have his gun in Gaines' restaurant. Q. Did you see him have his revolver out at any time that evening after you four boys drank the two bottles of beer in the road, and before you got to Gaines' shack at that time? (Objected to by defendant; not proper cross-examination, incompetent, irrelevant, and immaterial. Overruled, and defendant excepts.) A. I don't understand you; I don't understand. I never saw him have any gun. Q. Didn't you see him point the revolver at a woman whose land he crossed on the way up there, and threaten to kill her? (Objection; not proper cross-examination, incompetent, irrelevant, and immaterial. Overruled, and defendant excepts.) A. I told you I did not see him have a gun out. Q. Didn't you see him have his revolver out? (Same objection. Overruled, and defendant excepts.) A. I answered the question. Q. Didn't you hear him threaten to kill some lady who objected to his crossing her lot that first time? (Same objection. Overruled, and defendant excepts.) A. I did not see him pull a gun. I was with him all the time after the two bottles of beer were drank up to the time we got to Gaines' shack. Q. Did you cross any one's lot in going to Gaines' restaurant? (Same objection. Overruled, and

*I. EVIDENCE: collateral matter.*

defendant excepts.) A. I don't think we crossed any lot. It was in the roadway. Q. Did Mr. Williams talk with any lady on that trip that afternoon? (Same objection. Overruled, and defendant excepts.) A. I think he did not speak to any, not to my knowing. Q. Did you see that lady or talk to any lady on the road to the new shack, or up there, or coming back to Gaines' restaurant? (Same objection. Overruled, and defendant excepts.) Q. Do you know Reuben Gaines? (Same objection. Overruled, and defendant excepts.) Q. Did you have a conversation with him with reference to that matter— with reference to the defendant having pulled out his revolver on some lady on that trip? (Same objection. Overruled, and defendant excepts.) A. He did not pull it. Q. Have you talked with him since the shooting about this matter? (Same objection. Overruled, and defendant excepts.) A. Why, he talked to me that afternoon after it was done. Q. Did you talk with Reuben Gaines at his restaurant at some time after the shooting, and soon after, with reference to what you and the defendant were doing that afternoon?, (Same objection. Overruled, and defendant excepts.) A. I spoke to him like anybody else would. Nothing in particular about it. Q. Did you talk with him in the restaurant more than once I mean in regard to this transaction about which you have testified? (Same objection. Overruled, and defendant excepts.) A. I don't know about it. No, I don't remember of speaking to him but once. Q. Now, at that time and place in Reuben Gaines' restaurant, soon after the shooting, didn't you say, in substance, that when you and the defendant were driving to Gaines' restaurant that the defendant drove across some lady's lot, and she objected to it, and that the defendant pulled his gun and pointed it at her, and threatened to kill her, and that you asked him not to do it? (Objected to as incompetent, irrelevant, immaterial, and not proper cross-examination. Overruled, and

defendant excepts.) A. That is a mistake. I did not do it. Q. Didn't you tell him that last Sunday in the restaurant? (Same objection. Overruled, and defendant excepts.) A. No, I did not." This was an inquiry into a collateral matter, and the state was bound by the answers given. . *Swanson v. French*, 92 Iowa, 695. In view of the character of the answers, we should not reverse, but this was followed up by the state in rebuttal, when it introduced as a witness one Gaines, who testified as follows: "My name is Reuben Gaines. I know B. Lee. Q. Did you have a conversation with Mr. B. Lee at your restaurant last Sunday night in reference to the defendant, Dick Williams, having his gun out—in reference to the gun—at time when he was crossing a lady's lot on the afternoon of December 8th? Answer 'Yes' or 'no.' . (Defendant objects as incompetent, irrelevant, immaterial, and not rebutting.) Court: You may answer 'Yes' or 'No.' (Defendant excepts.) A. Yes, sir; I did. Q. You may state whether or not at that time you had in that conversation referred to the fact that the defendant had had his revolver out, and threatened to kill some woman who objected to his crossing her lot with his team, or that in substance. (Same objection. Question withdrawn.)" Here again we should not be disposed to interfere because of the character of the answers given, but for what afterwards transpired.

The bill of exceptions signed by the trial judge shows that in arguing the case to the jury one of the attorneys representing the state made use of the following language: "That the witness B. Lee had lied (referring to the question propounded to the said Lee about whether or not the defendant on the afternoon of the tragedy had threatened to shoot a woman), and claimed that the witness Reuben Gaines, when asked about it, said there was such a conversation; but on account of our objections did not ask him further questions. That the said Preston, in his argu-

ment, referred to the fact that the defendant might have offered evidence of his good character, and that the defendant was a man of a vicious character, and said that he was a bad Dick with a bad gun, and bad bullets and bad scar. The court further finds that the coun-

**2. MISCONDUCT of counsel.**  sel B. W. Preston, for the state, in his argument to the jury, stated as follows: 'The defendant had a right under the law to offer evidence to show good character, if he had any, and the fact that the defendant had not shown good character is sufficient evidence of his bad character, and I believe I have a right to comment upon the fact, gentlemen of the jury, and I think you, gentlemen of the jury, should consider it. The defendant is known around where he is known and lived as Bad Dick with a bad scar, and with bad scars in his face, with bad bullets and a bad gun. The defendant cut off these bullets at the end, and made crosses in the end of the lead so as to have them spread out when shot into the body, and make a wound more dangerous to life—a mushroom wound.' The statements of said Preston prior to the time his argument was reported were objected to and excepted to when made. The defense suggested that it would be better to have somebody report it and take it down, and upon such suggestion the order was so made so as to avoid interruption, of which counsel complained." In view of the use made of the proceedings before quoted, we think the court was in error in its rulings on the admission and rejection of evidence, and that counsel were guilty of such misconduct with reference thereto that a new trial should be granted. Moreover, the other parts of the argument quoted were outside the record, untrue in fact, and evidently very prejudicial. There is no evidence that defendant cut off the bullets and made crosses in the ends so that they would spread and make a mushroom wound. The reference to the right of the defendant to prove good character should not have been made.

II.   The court found that there was enough evidence to take the question of self-defense to the jury, and instructed with reference thereto.     Defendant asked it to

3. SELF defense: instruction. instruct that the burden was upon the state to show beyond a reasonable doubt that defendant was not acting in self-defense, but this it refused to do.   This was manifestly erroneous.   *State v. Bone*, 114 Iowa, 537, and cases cited; *State v. Shea*, 104 Iowa, 724.

III.   The evidence in the case was mainly directed to the question of defendant's drunkenness.   The court, in its charge, in referring to this matter, qualified two of its instructions by this statement, "Unless you find under the instructions hereinafter given that defendant was not accountable for his acts by reason of intoxication at the time."   Taking up the matter of drunkenness thereafter, it gave the following, which was all that was said on the subject:   "It is urged on the part of the defendant, and as a defense, that the defendant was sufficiently intoxicated at the time of the shooting to be incapable of forming an intent to commit crime.   On this branch of the case you are instructed that voluntary intoxication or drunkenness is no excuse for crime committed under its influence, short of actual insanity or loss of reason; and if a person is sober enough to intend to shoot at another, and actually does shoot at and hit him, without justification therefor, then the law presumes that such person is sober enough to form the specific intent to kill the one shot at, and in such case is criminally responsible for his act.   If, therefore, you find from the evidence that the defendant was in such a state of intoxication or drunkenness at the time of the shooting as to be incapable of forming an intent, or of distinguishing between right and wrong, it is a defense for a crime committed while in that condition as to all degree of the crime wherein an intent was necessary to complete the degree of the offense.   But if you find from the evidence that the defendant was sufficiently sober

at the time of the shooting to distinguish right from wrong, and to form a specific intent, then the defense of drunkenness cannot avail him."

Defendant asked the court to instruct that drunkenness should also be considered, if shown, as bearing upon the degree of his crime. The instruction asked should

4. MURDER: drunkenness: instruction. have been given. Under the statutes of this state murder is in two degrees. Murder of the first degree is the willful, deliberate, and premeditated killing of another with malice aforethought, either expressed or implied. The killing of a human being with malice aforethought, without premeditation or deliberation, is, generally speaking, murder in the second degree. It is manifest, then, that drunkenness should be considered, not only in its bearing upon the question of malice and intent, but, when murder in the first degree is charged, upon the question of willfulness, premeditation, and deliberation as well, for these are important considerations in determining the degree of the offense. The very essence of the crime of murder in the first degree is premeditation and deliberation, and, if these be absent, the crime is not higher, under ordinary circumstances, than murder of the second degree. Hence any facts which go to show a state of mind incapable of deliberation and premeditation should be considered. Hence it is generally held that evidence as to the intoxication of the defendant should be considered as bearing upon the question as to the degree of his offense. *State v. Sopher*, 70 Iowa, 494; *Cline v. State*, 43 Ohio St. 332 (1 N. E. Rep. 22); *Hopt v. Utah*, 104 U. S. 631 (26 L. Ed. 873); *Buckhannon v. Com.* 86 Ky. 110 (5 S. W. Rep. 358); *Robert v. People*, 19 Mich. 401; *State v. Johnson*, 40 Conn. 136; *People v. Williams*, 43 Cal. 345; *Aszman v. State*, 123 Ind. Sup. 347 (24 N. E. Rep. 123, 8 L. R. A. 33). Indeed, there seems to be no dissenting voice in the authorities on this proposition. *State v. Pasnau*, 118 Iowa, 501, relied upon by the state, is not in point.

Moreover, the instruction as given was erroneous in that the ability to distinguish between right and wrong test there given is not the proper one. This instruction should have plainly told the jury that if, from the evidence, it found that defendant was so drunk that he was incapable of forming an intent to do the act complained of, they should find him not guilty of the crime of murder. To this should have been added an instruction to the effect that his intoxicated condition, if shown, should also be considered by them as bearing upon the degrees of his offense. See authorities above cited, and also *State v. Donovan*, 61 Iowa, 370; *State v. Bell*, 29 Iowa, 316; *State v. Dorland*, 103 Iowa, 168. Other instructions are challenged, some of which, taken alone, are manifestly erroneous, but, as they are not likely to be repeated on a retrial, we shall not take time to point out the exact errors.

5. SAME.

IV. For the guidance of the trial court we may say that the indictment undoubtedly charges murder in the first degree, and that the criminality of the defendant's act may be determined with reference to his conduct toward Cooper; in other words, his guilt or innocence may depend upon the same considerations that would have governed had the shot which was fired killed Cooper instead of Sharper. This doctrine is supported by the great weight of authority. *People v. Molineux*, 168 N. Y. 264 (61 N. E. Rep. 286); *People v. Gordon*, 100 Mich. 518 (59 N. W. Rep. 322); *Tidwell v. State*, 70 Ala. 33; *Com. v. Eisenhower*, 181 Pa. 470 (37 Atl. Rep. 521, 59 Am. St. Rep. 670). There was no variance between the allegations and the proof. *State v. Barr*, 11 Wash. 481 (39 Pac. Rep. 1080, 29 L. R. A. 154, 48 Am. St. Rep. 890); *State v. Renfrow*, 111 Mo. 589 (20 S. W. Rep. 299).

6. MURDER: determination of guilt.

For the reason pointed out, it is apparent that the judgment must be reversed, and the cause remanded for a new trial.—REVERSED.