## 10756

### STATE ·v. GREEN

#### (110 S. E. 145)

1. HOMICIDE—DEFENDANT WHO SET SPRING GUN IN UNOCCUPIED HOUSE MERELY TO PROTECT HIS PROPERTY HELD GUILTY OF MANSLAUGHTER.—Defendant who set spring gun in unoccupied house, with the intention to kill any one who broke the locks and entered the house without regard to the intent of the intruder, merely to protect his property, and not his life, and who thereby caused the death of one who entered the building merely for the purpose of gratifying his curiosity, *held* guilty of manslaughter, notwithstanding Cr. Code 1912, § 178, prohibiting the breaking and entering of a dwelling house.

2 HOMICIDE—DEFENDANT WHO CAUSED ANOTHER'S DEATH BY SETTING SPRING GUN MERELY TO PROTECT PROPERTY CANNOT JUSTIFY KILLING ON GROUND OF SELF-DEFENSE.—Defendant who set spring gun in unoccupied house merely to protect his property, and who thereby caused death of one who entered house merely to gratify his curiosity, could not justify the killing on the ground of self-defense, and such defense is not available to a person who has killed another unless the circumstances were such as to justify a person of ordinary firmness and reason to believe himself in danger of losing his life or suffering bodily harm, and unless defendant himself so believed.

Before PEURIFOY, J., Dorchester, March, 1920. Affirmed.

J. A. Green indicted for murder and upon conviction of manslaughter appeals.

The appellant was indicted for the murder of one J. W. Mizzell, through the instrumentality of a trap or spring gun. The jury found him guilty of manslaughter, and he was sentenced to two years' imprisonment, whereupon he appealed to this Court.

W. B. Mizzell, a brother of the deceased, testified that he and his brother, the deceased, had been on a visit to a neighbor's house on Sunday afternoon, the 4th of January, 1920, which house was located some distance from the old residence owned by J. A. Green, and that, upon leaving the home of the friend whom they were visiting, they went out of the road some 500 feet to the residence of J. A. Green, the defendant, and, upon getting to the residence, admittance to which from the road was gained by way of a broken place in the wire fence, found the gate leading to the residence locked; the date of the homicide being January 4, 1920, Sunday evening. They reached the residence, and J. W. Mizzell, the deceased, looked over the premises somewhat, and said it was going to rack, and started to go into the house, forcing an entrance by breaking a lock at the bottom of the stairway leading to the upper story. Witness told his brother, the deceased, J. W. Mizzell, that it had been reported that the house had been dynamited, and that, if deceased did not want to get hurt or killed, he had better not go in the house, and that witness refused at the request or suggestion of the deceased to go in the house. After forcing open the door at the bottom of the stairway on the first floor, the deceased went upstairs, leaving the witness on the ground near the building. Witness heard a crash upstairs and the report of a gun, and heard his brother, the deceased, cry out, "Oh, Lord; I am shot with a dynamite."

Witness was called by deceased, and, running to him, found him scuffling downstairs. Witness picked him up, and assisted him onto the porch and then out into the back yard, where he laid him down. Witness gave the alarm for assistance, and while the alarm was being made his brother died.

Witness stated that, according to his recollection, the house had been vacant for four to six years, with periodical visits to the same by defendant, accompanied by de-

fendant's wife, when they stayed in the house from one to several days at each visit at intervals.

On cross-examination, the witness, Mizzell, stated that his brother, the deceased, J. W. Mizzell, had said before going upstairs that he (the deceased) had had a dream a few nights before that old man Green (Cummings), the grandfather of the defendant, had buried gold under the fireplace upstairs, and he was going to see if it was true.

The only witness for the defense was the defendant, J. A. Green himself, who testified that he had inherited this plantation from his grandfather some years before; that he had lived on the place for some years with his wife, farming the lands; that he concluded to move to Charleston, but continued to own the place, renting out a part of it and share-cropping the other; that he had been living in Charleston for several years last past; that about once every two weeks he would come up from Charleston to his place, which is about 30 miles from Charleston, near Ridgeville, to overlook his farm and the tenants; that often Mrs. Green, who is an invalid, accompanied him, and that they would spend from one to two or three days in the house, cooking and sleeping therein; that he planted a garden and carried vegetables back to Charleston with him; that he kept a part of the house furnished so that he could live in it when he came up from Charleston; that he had beds and furniture upstairs and cooking stove, tables, and cooking utensils downstairs; that in the particular room where the trap gun was set upstairs he had some old family furniture of mahogany, walnut, etc., which he prized very highly; that a number of depredations upon his property and thefts had been committed, which seemed to grow worse; that some of his furniture had been mutilated, and the locks to the doors broken, and the mantels torn down; that he built a strong wire fence along the public road about 500 feet from the residence, and locked the gate; that he

locked, on his last visit before the death of Mizzell, the door at the bottom of the stairs on the first floor, and put two locks to the door of the room where the trap gun was set.

On his last visit there preceding the homicide there had been so many depredations and thefts of his property that he thought he was warranted in taking some steps to protect the property in his absence. So he set the trap gun in a dry goods box and fixed it so it would shoot if a person broke open the door, which was locked with two locks. After fixing the trap gun he went out of a window and came down. The bottom door was locked also, and he put a strong lock on the gate to the fence protecting the house. His purpose in putting the trap gun there was to protect his property, and if the locks were broken and a person forced his way in the gun would shoot him. He endeavored to protect any innocent person by locking the yard fence gate, locking the door at the bottom of the stairs on the first floor, and by putting two locks on the door of the room containing the trap gun, which, he thought, would protect or warn any person except a desperate thief. Of course, if any one broke open the locks and the door the gun would shoot, because that was what he had put it there for, to protect his property. If he had any one in mind, any malice towards any one, or had desired to kill anybody, he would have used larger shot, not small shot. The defendant knew Mizzell well; rented land to him; but he did not live on the place nearby. Defendant is 50 years old, and married for years.

Dr. J. W. Ackerman testified as follows: Was called upon by Magistrate Vaughn, acting coroner, to make a post mortem examination of the dead body of J. W. Mizzell. He was lying on his back. Upon turning him over found upon examination a hole in his back caused from small shot from a shotgun, the shot entering his back

about middleway of his left side, slightly ranging upward; the majority of the shot entered a space of about 2 1-2 or 3 inches to a radius of about 4 inches, and that this wound was sufficient to cause death.

The record contains the following statement:

The presiding Judge delivered a general charge to the jury in which he defined murder and manslaughter. He also charged the jury that a person would have a right to protect his home or dwelling against one who was committing or attempting to commit a felony in respect thereto. He further charged the jury that, if a person set a trap gun in such a place and in such a manner as to evince a reckless disregard for human life, and a human being was killed, such a homicide would be murder. He further charged the jury that, if a person was negligent and careless in setting any trap gun or dangerous instrumentality in such manner that a human being was killed, such killing would be manslaughter, if the element of malice was lacking. He further charged the jury that a person has the legal right to set out a trap gun or any dangerous instrumentality, likely to cause injury to any human being, only when he has exercised, under all the circumstances, due care, prudence, precaution, and regard for the safety and protection of human life. He further charged the jury to give the defendant the benefit of every reasonable doubt arising out of any or all of the testimony. He explained to the jury the several forms of verdict which they might find in the case, to wit: Murder, which would mean death in the electric chair; murder with a recommendation to the mercy of the Court, which would mean life imprisonment; manslaughter, which would mean 2 to 30 years, imprisonment in the discretion of the Court; or not guilty.

The defendant submitted several written requests to the Court, which were charged or refused, as follows:

(1) That the question was one of intent, and that this was a question of fact largely for the jury to determine.

(Charged subject to the limitations in the general charge.)

(2)　That a dwelling house is where a man lives; and a man may have more than one dwelling.　(Charged).

(3)　That a man has the right to defend his hibitation against one who manifestly intends to commit a felony in respect thereto.　(Charged).

(4)　That, if a person break and enter a dwelling house with intent to commit a felony therein, this constitutes a felony which the owner may repel, using such force as is reasonably necessary. (Charged).

(5)　That such a case as this is tested by the law of self-defense, the trap gun representing the owner of the dwelling; that if the owner of the dwelling would have the right to shoot, if present in person, then he would have had the right to set a trap gun to defend his dwelling house in his absence; and that, if present in person he would have a right to act upon appearances in repelling a threatened felony, so it would not be unlawful to set a trap gun in a bedroom in a dwelling, locking the door, so that such a trap gun would fire if any person attempted to break or force the door, purposing to commit a felony therein; the trap gun, so to speak, acting upon appearances also.　(This request was refused).

The defendant appealed upon three exceptions, but the second was withdrawn.　The first and third exceptions are as follows:

. "(1)　The verdict and the judgment of the Circuit Court is wholly without testimony to support the same, in that the undisputed testimony shows that (1) the deceased, when shot, was breaking into the dwelling house, upstairs; (2) that the trap gun was set in a room upstairs in the dwelling, both doors, downstairs and upstairs, being locked to warn the casual or curious not to enter; that (3) the deceased broke the lock and forced the door downstairs, and was in the act of, and actually did, break the lock and force the

door upstairs when he was shot; that (4) the deceased was,
at the time shot, committing, or apparently attempting to
commit, a felony in the dwelling house of the defendant; and
(5) that the deceased was warned by his own brother, who
was present, and with him at the time and place he was
shot, not to enter or attempt to enter the dwelling in
question, as it was reported by the owner to be dyna-
mited.' "

"(3)    The Circuit Judge erred in refusing to charge the
jury that a case such as this is to be tested by the law of
self-defense, the trap gun representing the owner of the
dwelling; that if the jury believed the owner, if present,
would have had the right to shoot the deceased under the
circumstances, then he had a right to set the trap gun; and
that, as the owner if present would have had the right to
act upon appearances, so he had the right to set a trap gun
which would fire if a person attempted to break and force
an entry into the room in the dwelling, intending to commit
a felony therein; the trap gun would be, under such cir-
cumstances, so to speak, acting upon appearances also."

*Messrs. M. S. Connor* and *Wolfe & Berry,* for appellant,
cite:    *A person may dwell in two or more places:*    10 A.
& E. Enc. L. (2nd Ed.) 353.   *Place of residence is a ques-
tion of intent:* 107 S. C., 213.    *Breaking and entering a
dwelling house is a felony and may be repelled by such force
as is necessary:*   85 S. C., 277.

*Mr. A. J. Hydrick, Solicitor,* and *Mr. John A. Hiers,*
for respondent, cite:    *No motion for a directed verdict,
which prevents consideration of question of correctness of
verdict:*    Rule 77, Circuit Court; 83 S. C., 309; 105 S. C.,
42; 110 S. C., 315.   *Question of criminal negligence was
for jury:*   29 L. R. A., 154; 15 Ann. Cas., 584 (Wash.):
14 L. R. A. (N. S.) 346.   *Mere breaking and entering with-
out criminal intent is not a felony:*    85 S. C., 273. · *Ac-
cused could not do in his absence what would have been*

*unlawful if present*:   31 Am. Rep. 1, 59 Ala. 1.   *Use of trap gun was criminal homicide*: Whart. Cr. L., Secs. 418, 553.

December 6, 1921.

The opinion of the Court was delivered by MR. CHIEF JUSTICE GARY.

We desire to call special attention to these facts:

The deceased was unarmed when he entered the dwelling and broke the locks. He knew the house was vacant, and that he would not encounter the defendant, or any other human being.   The fact that the greater portion of the shot, which made a hole in the back of the deceased, entered a space of about 2 1-2 or 3 inches tended to show an intention on part of the defendant to kill any one who entered the house and broke the locks, without regard to the intent of the intruder.   The sole object of the defendant was the protection of his property, and not his life, as he knew that his life could not be in danger if the house was entered while he was in Charleston.   The testimony tends to show that the deceased entered the dwelling for the mere purpose of gratifying his curiosity.

The general rule in regard to spring guns is thus stated in 13 R. C. L., § 155:

"It seems that, according to the earlier common law, the setting of a spring gun in a dwelling house or the curtilage surrounding it was not, in itself, unlawful, and that, if a person was killed by its discharge while attempting to perpetrate a felony on the premises, no criminal liability was incurred.   The later cases, however, have departed from this rule, and take the view that, if a homicide results from the discharge of a spring gun, the person setting the gun is liable to indictment for murder or manslaughter.   Life may be taken, as we have seen, only in the protection and preservation of life, not when mere property rights are at stake. But, while modern authority may agree that culpability

arises from death caused in this manner, there is some difference of opinion as to the grade of the offense. At common law it would seem that the slayer must be guilty of murder where it appears that the purpose was to take life. If, however, the intention was not to take life, but merely to chastise the trespasser, and to deter the offender from repeating the same, the offense may be extenuated, and no more than manslaughter. * * * "

In *State v. Barr,* 11 Wash., 481; 39 Pac., 1080, the difference in the rule is thus stated, when the spring gun is set in a house not occupied:

"The crime of burglary has been so much extended by the statutes of this State that, excepting in the case of burglary of a dwelling house *when occupied by the owner or some member of his family,* there is no reason why more extreme means should be allowed for its prevention than to prevent other felonies. As to what may properly be done to prevent the burglary of a dwelling house when occupied is another question. There it is not simply the damage to the property which may result from the burglary * * * that is involved, but, in addition thereto, is the question of the risk to the lives of the inmates. It is common knowledge that burglaries under such circumstances often result in the death of some of the inmates of the dwelling upon which the burglary is committed, and for that reason it might well be held that a burglary of that kind could rightfully be prevented by such means as might result in death. * * * The undisputed facts showed that there was no person in this cabin whose life could have been endangered by a burglary committed thereon; hence, if what we have said is correct, it might not be prevented by means which might be expected to destroy the life of a human being." (Italics added.)

This case is reported in 29 L. R. A., 154, and 48 Am. St. Rep., 890.

In *Simpson v. State,* 59 Ala. 1 (reported in 31 Am. Rep. 1), it is said:

"The preservation of human life and of limb and member from grievous harm is of more importance to society than the protection of property. Compensation may be made for injuries to or the destruction of property; but for the deprivation of life, there is no recompense; and for grievous bodily harm, at most, but a poor equivalent."

Section 178 of the Criminal Code is as follows:

"Every person who. shall break and enter, or who shall break with intent to enter, in the daytime, any dwelling house or other house, or shall break and enter, or shall break with intent to enter, in the night time, any house, the breaking and entering of which would not constitute burglary. with intent to commit a felony or other crime of a lesser grade, shall be guilty of a felony. * * *"

In the case of *State v. Clark,* 85 S. C., 273; 67 S. E., 300, this Court, in construing that section, said:

"Under this statute the mere breaking of a house is not a crime, nor is the mere breaking and entering of a house, or mere breaking with intent to enter a house any crime. It is only where there is a breaking and entering, or a breaking with intent to enter, 'with intent to commit a felony, or other crime of a lesser grade,' that the crime denounced by the statute is complete."

The testimony as to the intent with which the deceased broke the locks and entered the house was conflicting, thus presenting an issue which was properly submitted to the jury.

What we have already said shows that the first exception cannot be sustained. We proceed to the consideration of the other exception, which raises the question whether a case like this is to be tested by the law of self-defense.

The following language of the Court in *Simpson v. State,* 59 Ala. 1; 31 Am. Rep. 1, shows that the test for which the appellant's attorneys contend is not practicable. .

"The secrecy and frequency of the trespass would not justify the owner in concealing himself, and with a deadly weapon taking the life, or grievously wounding the trespasser, as he crept stealthily to do the wrong intended. What difference is there in his concealing his person, and weapon, and inflicting unlawful violence, and contriving and setting a mute, concealed agency or instrumentality which will inflict the same, or it may be greater, violence? In each case the intention is the same, or it is to exceed the degree of force the law allowed to be exerted. In the one case, if the trespasser came not with an unlawful intent—if his trespass was merely technical—if it was a child, a madman, or an idiot, carelessly, thoughtlessly entering and wandering on the premises, the owner would withhold all violence. Or, he could exercise a discretion, and graduate his violence to the character of the trespass. The mechanical agency is sensitive only to the touch; it is without mercy, or discretion; its violence falls on whatever comes in contact with it. Whatever may not be done directly cannot be done by circuity and indirection. If an owner, by means of spring guns or other mischievous engines planted on his premises, capable of causing death or of inflicting great bodily harm on ordinary trespassers, does cause death, he is guilty of criminal homicide."

In *State v. McGreer,* 13 S. C., 464, the Court says:

"To make out a case of self-defense, two things are necessary: (1) The evidence should satisfy the jury that the accused actually believed that he was in such immediate danger of losing his life, or sustaining serious bodily harm, that it was necessary, for his own protection, to take the life of his assailant. (2) That the circumstances in which the accused was placed were such as would, in the opinion of the jury, justify such a belief in the mind of a person possessed of ordinary firmness and reason. It is not a question which depends solely upon the belief which

19—S. C. 118

the accused may have entertained; but the question is, what was his belief, and whether, under all the circumstances, as they existed at the time the violence was inflicted, the jury think he ought to have formed such belief."

It will thus be seen that, if the defendant had been present in person, and had killed the deceased, it would have been necessary for him to show by way of defense that the circumstances were such as were not only sufficient to justify a person of ordinary firmness and reason in believing that he was in danger of losing his life, or suffering serious bodily harm, but that he himself so believed. In using the spring gun it was impossible for him, at the time of the killing, to comply with these requirements. His Honor, the presiding Judge, properly charged the jury in regard to the setting of spring guns.

Appeal dismissed.