STATE OF IOWA, Appellee, v. JOE KELLY, Appellant.

**CRIMINAL LAW:** Self-Defense—Reputation of Assailants. An accused, on the issue of self-defense, may show that *all* the parties who, on his supported theory, were making a concerted attack upon him had the reputation of being violent and dangerous men.

**CRIMINAL LAW:** Instructions—Unallowable Assumption of Fact. Under an indictment for murder, and under a defensive plea of self-defense, it is error for the court to tell the jury that the accused admits the killing ''substantially as charged in the indictment.''

**CRIMINAL LAW:** Self-Defense—Evidence—Relevancy. On the issue of self-defense, questions are proper which call upon the assailants to explain why they returned to defendant's premises after having been requested to depart therefrom, and after having complied with said request.

*Appeal from Marion District Court.*—LORIN N. HAYS, Judge.

NOVEMBER 13, 1923.

DEFENDANT and one McAninch were jointly indicted for murder in the second degree. This defendant, demanding a separate trial, was tried separately, and convicted of manslaughter. He appeals.—*Reversed.*

*N. D. Shinn,* for appellant.

*Ben J. Gibson,* Attorney-general, and *Norman R. Hays,* County Attorney, for appellee.

PRESTON, C. J.—There is a sharp conflict between the testimony offered by the State and that offered by the defendant. The evidence for the State puts an entirely different phase on the transaction from the case presented by the defendant. However, the defendant was entitled to have his case heard on his theory of it, and on his theory of the evidence which he presented. Under the circumstances, we deem it necessary to set out only so much of the evidence, which is largely that of the defendant, as is necessary to show the errors, or some of them, which the defendant has assigned as grounds for reversal.

The killing occurred during the night of July 3, 1921. The defendant claims that he was acting in self-defense. Defendant is a negro, and at the time of the killing was living with his wife at Andersonville, a coal camp in Marion County. Defendant was employed at the mines as a coal miner. He is 31 years of age. The deceased, James Johnson, and his two brothers, Dave and Orval, lived in Knoxville. On the evening in question, the three brothers went from Knoxville to the home of defendant in an automobile, for the purpose of buying liquor from defendant. Defendant had some home brew on hand. Whitlatch and Etcher, and perhaps others, were at defendant's place. From the defendant's house they went to another place, and secured and disposed of a quantity of "chalk." They then went to another place, some two miles distant, where they obtained two quarts of whisky, and of it they appear to have drunk freely. Defendant went with them to this place, but says he did not drink of the whisky. Returning to defendant's home, they went into his front room, and amused themselves by playing his graphophone. Dave testifies that during this time deceased and defendant got into a dispute, and "Kelly ordered us out of the house," and that he and his brother Orval took deceased across the street to Watts's, and left him there.

"We stayed there a while, and then went outside again, walked down the road a little ways, and came back to Kelly's house."

Defendant testified as a witness. His version of the transaction is substantially as follows: That, after they got back from obtaining the whisky, they got out of the car and went into

his front room. They were playing the graphophone, and seemed all right.

"Deceased was sitting on the couch, and I went over and sat down by him. I asked him how he was, and he swore at me, and called me 'a black son-of-a ———.' I got up from the couch, backed away toward the kitchen door, and told them to take him out of there. They took him out, and after while McAninch came and told me that deceased had a knife, and was going to cut me in two before morning. A day or two before, I had asked McAninch for his shotgun, to go hunting with, but had not yet got it; so I said I wished I had that gun now, and maybe I could bluff them off. He went and brought it to me, and I put it in the front bedroom. When Dave and Orval Johnson came back, they called me outdoors, and wanted to make me think everything was all right. So I put the gun back into the house, and we three went in the kitchen and drank the last bottle of home brew. Then we went out in the front yard again, and after a while, deceased came over to us. The first thing I knew, someone knocked me down. I did not know which one of them it was. They kicked me in the side, and said they would get me now. I crawled out and got up, ran to the kitchen door and into the front room, reached through the bedroom door, and grabbed the gun. I only had one shell, and it was in the gun. Deceased followed me through the house, and said, 'You black son-of-a———, I'll cut your damn gizzard out.' When I grabbed the gun, he ran on out of the front door. I was afraid, and thought I had better get away from them; so I sneaked back through the kitchen, and was going out the back way and get away; but just as I reached the outside kitchen door, I heard them coming around the northwest corner of the house; so I thought I could get away by going around the northeast corner of the house and passing between my automobile and the house. When I got around the corner and almost to the automobile, here they came from the southeast corner of the house, right at me,—the three Johnson brothers, and one of them said, 'Get that G—d— nigger.' I was so scared I hardly knew what I was doing, and I just raised the gun and pulled the trigger; did not point it at anyone in particular, but it seemed like that was the only way to stop them. My lip was cut open against my

teeth when they knocked me down. When I fired, I ran right on, and as I passed Skipper's place, I threw the gun in his yard.''

Defendant's wife, 21 years of age, says:

''I have taught in public schools. * * * Along in the night, they returned to our house, came in and played the graphophone. Deceased was sitting on the couch, and he and defendant got into some kind of difficulty, and defendant ordered the Johnsons out. They used vile language in our house, and when defendant tried to make them stop it, they repeated it. When Dave and Orval took their brother out, I started across the street, but came back, came into the kitchen, and from there to the bedroom. I was sick, and had been feeling bad all evening, and was soon asleep. I was awakened by a noise of some kind, and heard someone say, 'I am going to get you right now.' Defendant came running in at the kitchen door, and deceased was right after him. Deceased had one hand raised, and said 'I'll cut your damn gizzard out.' I could not see what, if anything, he had in his hand. They passed from the kitchen into the front room. I heard a chair knocked over in the front room, and in a moment defendant came back to the kitchen and out of the back door. Just then, I heard someone rushing along the south side of the house, and someone said, 'Get that G—d— nigger;' and I heard a shot fired.''

McAninch gave testimony similar to that of the defendant, and further:

''Deceased said he would cut him [defendant] in two before morning, and showed me a knife. After some time, Mrs. Watts came out where I was, and asked me to go and tell the Johnson brothers to come and take him [deceased] out of their house. I hunted Orval up and told him, and he said, 'What the hell do you mean by giving us orders? You son-of-a-b—, you won't live till morning, giving us orders.' After the Johnsons had left defendant's house, I told defendant what they had said, and about seeing the knife. A few days before, I had promised defendant he could have my shotgun, to go hunting, etc. * * * There were a number of people in the camp up and around that night, and several were down at Adam's; also some up around defendant's house. There was some kind of confusion there,

and I could hear swearing and loud talk. I heard someone say, 'Get that G—d— nigger,' and immediately afterwards, saw the fire from a gun, and heard the shot. I went over to Kelly's, and saw Orval there. He said he was going to kill the first son-of-a-b— he saw; so I got scared, and went home."

Another witness testifies:

"I live about 100 yards from defendant's house. On the night of July 3d, there was drinking, quarreling, and noise. I could see people up at Kelly's. I heard loud swearing and confusion. Just before the shot was fired, I heard someone say, 'Get that G—d— nigger.' I saw the fire from the gun, but could not see who fired it. Just after the shot, someone cried out, 'Look out behind you, Joe.' When the remark was made to get that nigger, there seemed to be a kind of a rush or movement of a bunch of them toward the direction the shot came from. I could not tell who it was; but there was kind of a rushing sound, and I could see the movement."

The wife of the last witness says:

"I was in the house, having gone to bed. I could hear noise and confusion outside, but did not see anything. I heard a shot, and someone called out, 'Look out behind you, Joe.' "

A witness testifying for the State says:

"About midnight on the night of July 3d, I heard considerable loud talking and cursing at or near defendant's house. About one o'clock, one of the Johnson brothers came and wanted me to call the sheriff,—a man had been killed. I went over and found the dead body of James on an automobile cushion on the ground in defendant's front yard. Mrs. Kelly was washing the blood from his face."

1. In this situation, and after the foregoing evidence had been admitted, a witness was placed upon the stand by defendant, who said:

"I live in Andersonville coal camp. Have known the three Johnson brothers, Dave, Orval, and Jim, for many years. I knew them when they lived in Missouri. I knew them and of them for the past few years, since they lived in Marion County and other parts of Iowa. I know what the general reputation of James Johnson was, prior to July 3, 1921, at the place where he lived,

*1. CRIMINAL LAW: self-defense: reputation of assailants.*

as to whether he was a violent and dangerous man or otherwise. It was bad. Q. Do you know what the general reputation of Dave Johnson was prior to July 3d, at the place where he lived, with respect to his being a violent and dangerous man or otherwise? (Objected to as incompetent, irrelevant, and immaterial. Sustained. Exception.)''

The same question was asked as to the reputation of Orval Johnson, and the same record was made, and the defendant offered to show that the general reputation was bad. Another witness was called, and the same record made.

We think that the court erred in excluding the offered testimony as to the quarrelsome disposition of the two brothers, and that it was prejudicial error. It had a bearing on the question as to who was the aggressor, on the question of self-defense. *State v. Buford*, 158 Iowa 173. The three brothers seem to have been acting together, making serious threats against the defendant, and one of them knocked him down,—at least, that is the defendant's version of it. If all three were attacking and pursuing the defendant, and he was defending himself against all of them, there would seem to be as much reason for showing the character of the other two brothers as that of the deceased. The only answer of the State to this proposition, in argument, is that the only evidence in the case that the three were attacking defendant was the evidence of the defendant himself. There seems to be some other evidence, however, bearing on that question. But even so, the evidence of the defendant is not to be ignored, and it was enough, even though disputed, to permit the admission of the rejected testimony.

It is further contended by appellant that, had the defendant intended to shoot Dave Johnson or Orval, and missed him, and shot and killed the deceased, the quality of the act would have been determined by the same situation that would have governed, had he shot and killed the one intended (citing *State v. Williams*, 122 Iowa 115).

2. In Instruction No. 16, the court said to the jury:

''In this case the defendant admits the killing substantially as charged. He admits the time, place, and instrument by which and with which the act complained of was done,'' etc.

Appellant makes the following complaint of this instruc-

tion: Defendant did not admit the killing substantially as charged in the indictment; he admitted only the killing. Had

**2. CRIMINAL LAW: instructions: unallowable assumption of fact.**

defendant admitted the killing substantially as charged, it would have been equivalent to a plea of guilty.. Appellant further complains that, under the instructions, the jury was told to find the defendant guilty if they found that he did the killing substantially as charged in the indictment. As to this last sentence, defendant has not pointed out in the argument where such an instruction may be found. We have read the typewritten abstract and instructions, and do not find that language in the instructions. Had the court said that defendant admitted the killing, this, being the fact, would be no error. *State v. Graves,* 192 Iowa 623. But to say that the defendant admitted the killing substantially as charged in the indictment, is too broad. The error was not cured by what followed in the same instruction or in the other instructions. The indictment charged that the killing was with malice, that it was unlawful, and so on. The State attempts to meet this, as we understand the argument, by saying that, because the indictment was for second-degree murder, and the jury acquitted the defendant of that degree of the offense, the instructions in regard to the higher degree, under such circumstances, are without prejudice. But this does not meet the situation. While the indictment does charge murder in the second degree, it also charges, as an included offense, the crime of manslaughter.

3. This appears in the cross-examination of Dave Johnson:

"Q. When you left Kelly's house, at the time he ordered you out, did he interfere in any way with your leaving? A. No. Q. Then why did you not get into your automobile and go

**3. CRIMINAL LAW: self-defense: evidence: relevancy.**

home? (Objected to as incompetent, irrelevant, and immaterial. Sustained. Exception.)"

We think the answer should have been received. The Johnsons did go out when ordered out, but all three came back afterwards. The answer, if permitted, would have had a bearing upon the question of self-defense.

A large number of other alleged errors are assigned. Some of these relate to the refusal of the court to give offered instructions; others have reference to the instructions given by the

court. Some of the offered instructions were covered by those given. The language of the instructions may be worded in somewhat different language on a retrial. In view of the reversal, we do not deem it necessary or advisable to take up separately each of the numerous assignments. The matters complained of are not likely to occur on a retrial.

For the reasons given, the judgment is reversed and the cause remanded for trial.—*Reversed.*

EVANS, ARTHUR, and FAVILLE, JJ., concur.