# Richmond.

## IRVINE V. PIERCE v. COMMONWEALTH.

### January 18, 1923.

1. HOMICIDE—*Justifiable Homicide—Defense of Property Alone.*—A killing in defense of one's property, where there is no element of personal danger to the killer, is not justifiable homicide.

2. HOMICIDE—*Self-Defense—Defense of Property—Questions of Law and Fact.*—Neither in defense of person nor property can one go further than is reasonably necessary for that purpose, and whether or not that which was done in a particular case was justified under the law must be a question of fact, or a mixed question of law and fact, and not a mere question of law.

3. HOMICIDE—*Justifiable Homicide—Defense of Property.*—There are but few offenses that the law suffers to be punished with death, and the law does not sanction the infliction of the death penalty by an individual for the mere protection of his property from trespass or larceny.

4. HOMICIDE—*Protection of Property—Spring Gun.*—The setting of a spring gun upon one's premises at common law, it would seem, was not unlawful, and if a person was killed by the gun while attempting to perpetrate a felony, no criminal liability was incurred. But later cases have departed from this rule. Life may be taken only in the protection and preservation of life, and not when mere property rights are at stake. Therefore, modern authorities are agreed that if a homicide results from the discharge of a spring gun, the person setting the gun is liable for murder or manslaughter.

5. HOMICIDE—*Spring Gun—Manslaughter—Case at Bar.*—In the instant case defendant set a spring gun at the door of his shop and by its discharge a policeman was killed, who, in the course of his rounds, tried the door to see whether it was locked. While the jury might have found defendant guilty of involuntary manslaughter, if they believed from the evidence that the circumstances showed that the defendant was not reckless, wanton and indifferent to the rights of others in setting the gun, as where he exercised due care to render the gun safe against all persons other than a person attempting to enter the store in the nighttime by force, or where he set the gun solely for the purpose of protecting his property from a violent felony, and had care for the rights of others, but was negligent in setting the gun, yet in the instant case there was evidence supporting a verdict of murder in the second degree.

6. HOMICIDE—*Spring Gun—Murder in the Second Degree—Case at Bar.*—In the instant case accused had set a spring gun at his shop door and by its discharge a policeman was killed, who, in the course of his rounds, tried the door to see whether it was locked. The store had previously been entered feloniously, and accused testified that he had heard persons unknown discussing the question of entering and robbing ·the store. Accused, according to his own testimony, fully realized the danger from the gun to any person who might lawfully enter the door, and he failed to warn the police, who were in the habit of testing the door, of the danger.

*Held:* That the evidence supported a verdict of murder in the second degree.

7. SPRING GUN—*Warning—Implied Malice.*—One who sets a murderous spring gun where there is a fair possibility of its killing innocent persons should warn those clearly exposed to such danger of its existence, and the omission to give such warning is criminal and within the rule which implies malice from the wanton and reckless disregard of the safety of others.

8. HOMICIDE—*Omission to Perform Duty.*—Whenever death is shown to have been the immediate result of an omission to perform a duty imposed by law, or by contract, the person charged with the performance of the duty will be deemed guilty of culpable homicide.

9. CRIMINAL LAW—*View—Presence of Accused.*—It is error on a prosecution for homicide to permit the jury to view the premises while accused remained in the courtroom. ·

Error to a judgment of the Corporation Court of the city of Danville.

*Reversed.*

The opinion states the case.

*Harris & Harvey* and *John L. Lee,* for the plaintiff in error.

*John R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General,* and *Leon M. Bazile, Second Assistant Attorney-General,* for the Commonwealth.

PRENTIS, J., delivered the opinion of the court.

Irvine V. Pierce has been convicted of murder in the second degree and sentenced to fifteen years in the peni-

tentiary.    He relies upon the assignment that there was a conviction of murder in the second degree, while he claims that in no event does the evidence justify a conviction of any higher grade of homicide than involuntary manslaughter, for which the extreme punishment is confinement for five years in the penitentiary.

The deceased, Jones, a policeman in the city of Danville, was shot by a spring gun while in the performance of his duty under these circumstances: The accused, who kept a small store and a shop for the repair of shoes, in which no one slept, had been troubled for several years by burglars.    Some small boys had been apprehended for the larceny of cigarettes about six months before the occurrence.    He testified that while in the store one night just before he set the spring gun which killed the policeman, he heard two men on the outside discussing whether they should enter and rob the store, but that upon the suggestion of one of them that it was dangerous because some one was inside, they left.    A few days thereafter he loaded and set a gun inside the street door of the building, so aimed as to fire into the body of any person who opened the door from the outside.    While policemen, who were witnesses for the Commonwealth, testified that before the night of the tragedy this door was usually fastened on the outside with a padlock, the accused testified that this padlock had been removed some time previously and was then in use on the rear door of the house, while this front door was securely fastened by a Yale lock.    He testified that out of regard for his own safety he had also placed a wooden button or latch on the inside of the door, nailed with a single nail, so that if on any occasion he had inadvertently failed to lock it with the Yale lock and then undertook to enter through this door, the resistance of this button would remind him of his own

danger from the spring gun.   His customary method of
entering the store while the spring gun was thus set was
through the rear entrance and then through a trap door
in the floor of the store.   He had complained to the po-
lice of these robberies and threatened robberies, and the
evidence is clear and convincing that he knew that the
policemen were on the watch to prevent their recur-
rence, that it was their nightly habit to patrol the street
for the protection of property and to test this front door
for the specific purpose of discovering whether or not
it was securely fastened.   He was at his store as late as
11.30 on the night of the tragedy.

The deceased and another policeman, in the per-
formance of their duty, were patrolling the street and
trying the doors at about three o'clock in the morning,
and his companion testified that the deceased "whirled
all at once and pushed the door with his foot and it flew
open and the report of the gun sounded, and he grabbed
his shoulder and staggered up the street and said 'He
has killed me.' "   The gun was loaded with shot, which
entered the upper left part of the chest of the deceased
and he died in a few minutes.

It was discovered that the door was not locked, the
bolt of the Yale lock being held back by the catch with
which it was equipped and if the door was then fastened
at all it was held only by the wooden button, but there
is no evidence other than that of the accused that there
was such a button, and no other witness testified to
having seen it.

It is insisted for the accused that he only did what he
had the legal right to do in setting this spring gun, and
hence cannot be charged with anything but inadver-
tence or forgetfulness and the unintentional killing of
the deceased.

The trial court, to some extent, recognized this view

by giving at the instance of the Commonwealth, instruction "B" in this language:

"The court instructs the jury that whether a man has a right to set a trap gun depends upon the time, place and circumstances under which said gun is set. A man has the right to set a trap or machine to protect his person or property from a violent felony provided the probable consequences of setting of such trap or machine is no more than he would have the right to do in person if he were present at the time of the attempt to commit said felony.

"If the jury believe from the evidence, beyond a reasonable doubt, that the defendant did set the trap gun in such a place and in such a manner and under such circumstances as to knowingly endanger the life of innocent persons and with a wanton and reckless indifference to the rights of others, under such circumstances as to evince a heart regardless of social duty and fatally bent on mischief, and as a result of the setting of said gun under such circumstances the deceased was shot and killed by the said trap gun, then such killing is malicious and the defendant is guilty of murder in the second degree, and the jury should fix his punishment at confinement in the penitentiary for not less than five nor more than twenty years.

"If, however, the jury should not believe that the circumstances under which the defendant set the trap gun showed wanton and reckless indifference to the rights of others, but that he set it solely for the purpose of protecting his property from a violent felony and had care for the rights of others, but was negligent in so setting said gun and in arranging the premises after setting said gun, and that as a result of said negligence the deceased came to his death by being shot with said trap gun, then they should find the defendant guilty of involuntary

manslaughter, and the jury should fix his punishment at confinement in the penitentiary for not less than one nor more than five years, or in their discretion by a fine not exceeding one thousand dollars or confinement in jail not exceeding one year, or both such fine and confinement in jail."

The court also gave, at the instance of the accused, instructions 10 and 12:

10. "The court instructs the jury that if they believe from the evidence that the defendant set the trap gun in the evidence mentioned with the intent only to protect his property against the perpetration of a felony, then such intent was lawful."

12. "The court instructs the jury that if they believe from the evidence that the defendant was the proprietor of a storehouse in the city of Danville, Virginia, in which he kept things of value; that said storehouse, on one or more occasions prior to the occurrence which caused the death of the deceased, had been feloniously entered in the nighttime for the purpose of committing larceny therein; and that the defendant reasonably believed that it was necessary for him to set a trap gun in said storehouse for the purpose of protecting it against the perpetration of a felony; he had a right to do so, provided he exercised due and proper care in the arrangement of the said gun so as to render it safe against all persons other than a person attempting to enter the store in the nighttime by force.

"And if the jury believe from the evidence that the door to said store behind which the trap gun was set, and which was opened by the deceased at the time of his death, had been arranged on previous nights by the defendant with due regard to the safety of all persons attempting to enter there through without any felonious intent, by fastening said door on the inside with a

Yale lock and a button, so that it could not be entered
except by force and violence, but that on the night of
the death of the deceased the defendant had inadver-
tently and without any evil intent, overlooked, forgot
and omitted to have said Yale latch locked and the but-
ton in place so that the door could be opened without
force and violence or without evil intent, then he was
guilty of negligence which resulted in the death of the
deceased, for which the defendant can be punished for
no higher grade of offense than involuntary man-
slaughter."

It is unnecessary to recite the other instructions.

It is observed, therefore, from these three instructions,
that while the trial court did not instruct the jury that
they might find the accused guilty of murder in the first
degree, it submitted to them the question as to whether
he was guilty of murder in the second degree or of in-
voluntary manslaughter.

[1-3] There are cases in this State and elsewhere
which have held that a killing in the protection of one's
property is justifiable homicide.   Those to which we
have been referred are those in which there was an al-
tercation between the parties involved and the element
of personal danger also appeared. *Parrish* v. *Common-
wealth*, 81 Va. 1; *Stoneham* v. *Commonwealth*, 86 Va. 523,
10 S. E. 238.

The better rule and the modern tendency, however,
are indicated in *Fortune* v. *Commonwealth*, 133 Va. 669,
112 S. E. 861, which expressly disapproves the *Parrish
Case*, and in *Montgomery* v. *Commonwealth*, 98 Va. 842,
36 S. E. 371, which was a case of trespass upon land,
where the trespasser was assaulted with a deadly
weapon, where this is said:   "The instruction as given
contains the general rule, which is sound as an abstract
proposition, that every man has the right to defend his

41

person or property, but it ignores the well settled and important modification of the rule that in defense of person or property one cannot, except in extreme cases, endanger human life or do great bodily harm. The law is clearly stated by a learned judge in *State* v. *Morgan,* 3 Ired. 186, 38 Am. Dec. 714, as follows: 'When it is said that a man may rightfully use as much force as is necessary for the protection of his person and property, it should be recollected that this rule is subject to this most important modification, that he shall not, except in extreme cases, endanger human life or do great bodily harm. It is not every right of person, and still less of property, that can lawfully be asserted, or every wrong that may rightfully be rendered by extreme remedies. There is a recklessness—a wanton—disregard of humanity and social duty in taking, or endeavoring to take, the life of a fellow-being, in order to save one's self from a comparatively slight wrong, which is essentially wicked, and the law abhors. You may not kill, because you cannot otherwise effect your object, although the object sought to be effected is right. You can only kill to save life or limb, or prevent a great crime, or to accomplish a necessary public duty.' See also, 1 Bishop on New C. L., secs. 839, 841, 850.''

In *State* v. *Barr* (1895), 11 Wash. 481, 39 Pac. 1080, 48 Am. St. Rep. 890, 29 L. R. A. 154, in which a conviction of murder in the second degree was sustained, it appeared that the owner of a cabin (apparently remote), who left it for several months' absence, placed a spring gun therein loaded with a double charge of powder and shot, and in addition thereto a loaded 45-90 Winchester rifle cartridge placed therein on top of the shot and powder. It was aimed directly at the casing of the door in such a way that a person of ordinary height standing in front of the door and placing his hand

on the knob would, upon pushing the door open a few inches, receive the entire charge in his body. The windows and door were then nailed up, the door being also locked with an insecure lock. The best of the contents of the cabin had been removed to the house of a neighbor, and those articles remaining were of small value. The deceased and two companions, thinking the cabin unoccupied and that nobody had lived in it for a long time, decided that they would go in and sleep there, instead of proceeding to a road construction camp in accordance with their original purpose, and the deceased was killed instantly in attempting to make an entrance through the door. There was also testimony to the effect that a placard bearing the word "Danger," had been posted on the outside of the boards which had been nailed over the door. The principal contention of the accused there was, that in setting the gun, as above stated, he only did what he had an absolute right to do, and asked the court so to instruct the jury, and the refusal of the court to do so was assigned as error. After asserting that the universal principle is that neither in defense of person nor of property can one go farther than is reasonably necessary for that purpose, that this principle followed to a logical conclusion establishes the proposition that whether or not that which was done in a particular case was justified under the law must be a question of fact, or a mixed question of law and fact, and not a pure question of law, and hence that the court could not in that case take the question from the jury, the court proceeds thus:

"The reason why the use of such means was allowed to prevent crimes of that kind in England was that they were there punishable by death. This being so, there was reason for the rule. If one was about to perpetrate a crime for which, under the law, his life would be for-

-feited, there was reason in holding that his life might be taken if necessary to prevent his committing it. But, in this country, few crimes subject the ones who have ·committed them to the death penalty, and it is only as to those which do that the reason of the rule has any ·force. What were felonies at common law usually subject the offender here to comparatively light punishment, and, upon principle, it should be here held that ·one could only properly make use of means which might be expected to cause death to prevent the commission of ·a capital offense.

"We are aware that courts of high standing have ·come to a contrary conclusion, and have held that such .means might be made use of to prevent the commission of some felonies, especially to prevent the crime of burglary; but it seems to us that in so doing they have lost ·sight of the changed conditions of things in this country, and have adhered to the English rule when the reason therefor has no existence. The crime of burglary has been so much extended by the statutes of this State, that, excepting in the case of burglary of a dwelling house, when occupied by the owner or some member of his family, there is no reason why more extreme means ·should be allowed for its prevention than to prevent other felonies. As to what may properly be done to prevent the burglary of a dwelling house when occupied is another question. There it is not simply the damage to the property which may result from the burglary, or the :sanctity connected with the property when so protected that it can only be reached by the commission of a burglary that is involved, but in addition thereto is the question of the risk to the lives of the inmates. It is common knowledge that burglaries under such circumstances ·often result in the death of some of the inmates of the ·dwelling upon which the burglary is committed, and,

for that reason, it might well be held that a burglary of that kind could rightfully be prevented by such means as might result in death.''

The court applying these principles in that case, continues: "It must result that not only was the defendant not entitled to the instruction asked for, but that, on the contrary, the court might have been justified in holding that the defendant did that which he had no right to do. The undisputed facts showed that there was no person in this cabin whose life could have been endangered by a burglary committed thereon; hence, if what we have said is correct, it might not be prevented by means which might be expected to destroy the life of a human being. That the means used were of that kind is evident, whether judged by what might reasonably have been expected to have been the result, or by the result itself.''

In *State* v. *Marfaudille* (1907), from the same court, 48 Wash. 117, 92 Pac. 939, 14 L. R. A. (N. S.) 346, 15 Ann. Cas. 584, where the accused had put a spring gun in a trunk which contained personal property of small value, and a woman actuated solely by curiosity was killed by this gun as she opened the trunk, a conviction was reversed because the State in that case contended as a matter of law that the accused was guilty of murder in the second degree; but the rule that one has no right to take human life, directly or indirectly, to prevent a mere trespass upon or theft of his property is reaffirmed.

In *Simpson* v. *State* (1877), 59 Ala. 1, 31 Am. Rep. 1, the accused was indicted for assault with intent to murder, and it was there said, in substance, that if an owner, by means of spring guns or other mischievous engines planted for the prevention of trespass on his premises—not the dwelling house—and capable of causing death, or of inflicting great bodily harm, on ordinary trespass-

ers, does cause death, he is guilty of criminal homicide; but if the instrument is not deadly in character and was intended only to alarm or inflict slight chastisement, or to retain the trespasser, there may be no offense, unless death ensues, in which event the offense will be manslaughter. In criticism of the doctrine that the setting of spring guns to protect property can be justified so as to avoid criminal liability, the court among other things said: "The proposition itself subordinates human life, and the preservation of the body in its organized state, to the protection of property. It subjects the man to loss of limb or member, or to the deprivation of life, for a mere trespass, capable of compensation in money. How else can the owner protect himself, it is asked. The answer may well be, he is not entitled to protection at the expense of the life or limb or member of the trespasser. All that the latter forfeits by the wrong is the penalty the law pronounces. * * It may well be asked in return, if the owner has the right to visit on the trespasser a higher penalty than the law would visit? Has he a right to punish a mere trespass as the law will punish the most aggravated felonies, which not only shock the moral sense, evince an abandoned, malignant, depraved spirit, but offend the whole social organization? There are but few offenses the law suffers to be punished with death. Whether this extreme penalty shall be visited the law submits to the discretion and to the mercy of the jury—they may consign the offender to imprisonment for life in the penitentiary. * * Shall the owner, for the prevention of a trespass, inflict absolutely the penalty of death, a jury could not inflict, nor a court sanction? Inflict it without the opportunity the jury has, when they may lawfully inflict it, of lessening it, in their mercy and discretion, to imprisonment? Shall he in protection of his property, lacerate

the body—a punishment so revolting that it has long been excluded from our criminal Code? If the owner is vexed by secret trespasses, and their repetition, his own vigilance must, within the limits of the law, find means of protection. Stronger inclosures and a more constant watch must be resorted to, and a stricter enforcement of the remedies the law provides will furnish adequate protection. If these fail, it is within legislative competency to adapt remedies to the exigencies and necessities of the owner.''

In *Schmidt* v. *State* (1914), 159 Wis. 15, 149 N. W. 388, Ann. Cas. 1916E, 108, a conviction for murder in the second degree is upheld where the deceased was killed by a spring gun set in an orchard, for the avowed purpose of frightening boys. An instruction was held to be proper which limited the jury to conviction of murder in the first or second degree and manslaughter in the second degree, and refused to submit manslaughter in the fourth degree or excusable homicide. In that State there is a statute which punishes the setting of spring guns for killing game, or for any other purpose, and provides that if the death of any person is caused thereby the offender shall be deemed guilty of manslaughter in the second degree. In construing this statute the court said: ''The intent of the legislature was to prevent the setting of guns generally. The words 'for any other purpose' were evidently not intended to have their general meaning disassociated from the context of the statute, because such a meaning would include intentional and all other felonious killing of a human being, which the legislature manifestly did not contemplate. Reading the words 'or for any other purpose' in their connection with the other parts of the statute, their meaning naturally is to be construed as if it read 'for any other similar purpose,' that is a purpose

other than where there was a design to effect the death,. or physical injury to another, or the wrongful destruction of property, as well as where a gun was set with a. purpose evincing a depraved mind, regardless of danger to human life. In these latter cases, if death results. from the setting of the gun, the killing would come within the law regulating homicides, but where such death is not one of these, then the statute makes it manslaughter in the second degree, and it cannot be less."

The recent case of *State* v. *Green* (1921, S. C.), 110, S. E. 145, 19 A. L. R. 1431 (note), holds that the law of self-defense does not apply to the setting of a spring gun to protect furniture in one's unoccupied dwelling from marauders, so as to absolve the property owner from liability for killing one who forces his way through. locked doors to where the gun is placed. In that State,. the distinction between murder in the first and murder in the second degree does not obtain, and this appears: "The presiding judge delivered a general charge to the jury in which he defined murder and manslaughter. He also charged the jury that a person would have a right. to protect his home or dwelling against one who was. committing or attempting to commit a felony in respect. thereto. He further charged the jury that if a person set a trap gun in such a place and in such a manner as to evince a reckless disregard for human life, and a. human being was killed, such killing would be manslaughter, if the element of malice was lacking. He further charged the jury that a person has the legal right to set out a trap gun or any dangerous instrumentality, likely to cause injury to any human being, only when. he has exercised, under all the circumstances, due care,. prudence, precaution, and regard for the safety and protection of human life. He further charged the jury to give the defendant the benefit of every reasonable doubt.

arising out of any or all of the testimony. He explained to the jury the several forms of verdict which they might find in the case, to-wit: murder, which would mean death in the electric chair; murder with a recommendation to the mercy of the court, which would mean life imprisonment; manslaughter, which would mean two to thirty years' imprisonment, in the discretion of the court; or not guilty." This charge was held correct.

[4] This statement in 13 R. C. L., sec. 155, p. 853, appears to be a fair deduction from the cases: "It seems that, according to the earlier common law, the setting of a spring gun in a dwelling house or the curtilage surrounding it was not in itself unlawful, and that if a person was killed by its discharge while attempting to perpetrate a felony on the premises, no criminal liability was incurred. The later cases, however, have departed from this rule, and take the view that if a homicide results from the discharge of a spring gun the person setting the gun is liable to indictment for murder or manslaughter. Life may be taken, as we have seen, only in the protection and preservation of life, not when mere property rights are at stake. But while modern authority may agree that culpability arises from death caused in this manner, there is some difference of opinion as to the grade of the offense. At common law, it would seem that the slayer must be guilty of murder, where it appears that the purpose was to take life. If, however, the intention was not to take life but merely to chastise the trespasser, and to deter the offender from repeating the same, the offense may be extenuated and no more than manslaughter; the law so far recognizing the adequacy of the provocation arising from the trespass."

In *Whiteford* v. *Commonwealth*, 6 Rand. (27 Va.) 721, 724, 18 Am. Dec. 773, there is this language: "There are many instances in which the act would not be con-

sidered so wilful, deliberate and premeditated, as to make it murder in the first degree; yet, it would be murder at common law, and, therefore, by the statute, would be considered as murder in the second degree. If a workman throws a stone or a piece of timber from a house, in a populous city, into the street, where he knows people are passing, and gives them no warning, and kills a man, it is murder; yet, if it is from criminal carelessness instead of a wilful design to kill, or do great bodily harm, it is murder in the second degree; so, if a person shoots at a fowl with the felonious intent of stealing it, and kills a person, he is guilty of murder, but it wants the ingredient of a wilful killing, and, therefore, is only in the second degree.''

It is said in *Carpio* v. *State*, 27 N. M. 265, 199 Pac. 1012, 18 A. L. R. 916, note, where the accused shot at one with murderous intent and killed another, ''The malice followed the bullet.''

[5-8] Applying these precedents and doctrines to the facts of this case, we must determine whether the evidence supports the verdict of murder in the second degree. That the jury might have found him guilty of involuntary manslaughter is true, if they believed from the evidence that the circumstances showed that the defendant was not reckless, wanton and indifferent to the rights of others. This clause of instruction ''B'' would have justified such a verdict, ''but that if he set it solely for the purpose of protecting his property from a violent felony, and had care for the rights of others, but was so negligent in so setting said gun and in arranging the premises after setting said gun, and that as a result of said negligence the deceased came to his death by being shot with said trap gun, then they should find the defendant guilty of involuntary manslaughter  *  *.''  They might have found a similar

verdict if they had believed the recitals of instruction 12, heretofore quoted. There is evidence, however, which tends to support their verdict of murder in the second degree. The accused, according to his own testimony, realized the extreme danger to himself, because he says that for his own protection he placed a button on the door so as to remind him of the peril, and by the same token he must have realized that it also menaced every person who might lawfully enter the door. This peril being so manifest to him, what is the fair inference to be drawn from the fact that he failed to inform the police department, or those policemen who were in the habit of patrolling that street and testing his front door for the purpose of guarding his property? Is it unfair to characterize this omission as criminal and within the rule which implies malice from the wanton and reckless disregard of the safety of others? There is another principle of the law to the effect that whenever death is shown to have been the immediate result of an omission to perform a duty imposed by law, or by contract, the person charged with the performance of the duty will be deemed guilty of culpable homicide. This doctrine has been applied where children or other dependent members of one's family have been allowed to starve to death or die for want of proper medical attention. We think it not an undue extension of these rules to hold that one who sets a murderous spring gun where there is a fair possibility of its killing innocent persons should warn those clearly exposed to such danger of its existence. The peculiar circumstances of this case, and especially the knowledge of the accused that the policemen were in the habit of testing his door, imposed upon him the duty of informing them of their peril. We cannot say then that the jury were unwarranted in finding that his failure to do so, under the circumstances, so en-

dangered the lives of innocent persons, in case on any occasion he inadvertently failed to lock his door, as to indicate a reckless indifference to the lives of others and a heart regardless of social duty. As a further indication of his willingness to take human life, he had, according to the Commonwealth's witnesses, another spring gun set in the cellar. According to his account, however, it was neither set nor loaded, but he admitted that his purpose was to set it so that it would kill anyone who entered the cellar and opened his chicken coop. This obvious and avowed purpose to kill and his act in furtherance of his purpose evinces a mind reckless of human life.

Whatever justification there may have been, or may possibly still exist, for the placing of spring guns for the protection of occupied residences in remote sections which are without police protection, there is little reason for the use of such barbarous devices under modern conditions in the towns and cities.

This lurking instrument of death was not only a menace to robbers but also to the policemen, firemen and friends of the accused whose duty or friendship might at any time require them, for some lawful purpose, to enter the building by force.

Our conclusion is that the jury would have been justified in taking either view of the evidence, and nothing that we have said by way of support for our view of the legal question raised must on another trial be construed as expressing any opinion whatever as to the weight of the evidence.

[9] A conviction either of manslaughter or of murder in the second degree would be affirmed but for this fact which is disclosed by the record: The jury were permitted to view the premises while the accused remained in the court room. In the judgment of the other mem-

bers of the court, and for the reasons fully stated in the opinion in the case of *Noell* v. *Commonwealth, ante* p. 600, 115 S. E. 679, this day handed down, this was error, because the presence of the accused at the view was essential to the validity of the conviction, and therefore the judgment is reversed and the case remanded for a new trial.

*Reversed.*