# Richmond

## LOUIS CROCKETT v. COMMONWEALTH OF VIRGINIA.

April 26, 1948.

Record No. 3313.

Present, All the Justices.

688

The opinion states the case.

*Gordon B. Ambler*, for the plaintiff in error.

*Harvey B. Apperson, Attorney General*, and *Henry T. Wickham*, for the Commonwealth.

MILLER, J., delivered the opinion of the court.

Louis Crockett shot and killed Clifton Ward in the town of Urbanna. He was indicted, tried and convicted of murder in the first degree and sentenced to the penitentiary for the term of his life.

The accused does not challenge the sufficiency of the evidence to sustain the verdict but relies entirely upon certain alleged errors of law which he claims were made by the court during the progress of his trial. However, in order to understand the points he relies upon, the facts must be related.

For the past ten or twelve years Crockett had been employed by Mr. George Richardson of Richmond as captain of his yacht, the Betty Lee, which Mr. Richardson kept in the harbor at Urbanna. Mr. Richardson was in the habit of going to Urbanna on Friday nights to board the yacht. Crockett had orders from him to have the yacht ready and to remain on board until ten p. m. each Friday night to await the arrival of Mr. Richardson and his party. If Mr. Richardson did not arrive by ten o'clock, Crockett had permission to go home.

On Friday, August 30, 1946, Crockett was expecting Mr. Richardson to arrive as usual. That afternoon he went on board a boat belonging to one Carson Shores and there engaged in a card game. Clifton Ward was also there

playing cards, along with several other persons and all of them were partaking of intoxicating drink. Crockett accused Ward of not putting up his part of the money in the game, whereupon Ward knocked Crockett's hat off. They resumed the game and played one or two more hands when Crockett again accused Ward of not putting up his part of the money. Strong derogatory language was used by each of the parties. According to the witnesses for the Commonwealth, Crockett used the most offensive language, but he charges Ward with having used equally offensive language toward him. Two witnesses say Ward then struck Crockett three times with his fist and knocked him to the floor, rendering him unconscious. Crockett says Ward struck him with something which he thinks was a gin bottle. From no testimony does it appear that Crockett undertook at any time to strike back.

The following injuries were inflicted upon Crockett by Ward:

His cheek and eye were bruised, his face lacerated, and his nose broken. He did not cease to bleed from his broken nose until many hours later. Evidence of this severe beating was disclosed by blood upon his clothes, which were described by one witness as "covered with blood", and upon the floor of Carson Shores' boat, the floor of the wharf and on several towels. It also soiled and discolored the charts on the "Betty Lee" used by him after the homicide to cross the Chesapeake Bay. There was some bloody discharge from his nose for days afterwards. Upon regaining consciousness a minute or two after the beating, he was helped from the boat by Carl Parks, one of the parties who had been engaged in the card game.

When Crockett left the boat of Carson Shores, which was tied at Hurley's wharf, it was between six and seven o'clock in the evening. A short time later Shores, Ward and one Payne went to a skating rink in the Shores' boat, a distance of some 500 yards. After getting something to eat and skating, they returned to the Urbanna Beach Hotel wharf where Shores had been keeping his boat. Ward was

then asleep in the cabin. Upon securing the boat to the wharf, Payne went into the cabin and awakened Ward. The homicide occurred between 10:00 and 10:30 p. m. There were no eye-witnesses to the actual shooting other than Crockett and Ward, but it happened very quickly after Ward had been aroused from his sleep in the cabin. Ward then started to leave the boat and was shot in the chest by Crockett, the bullet coming out of his back about two inches lower than where it entered his body. He fell in the cockpit of the boat, his body extending into the cabin.

The testimony of two Commonwealth's witnesses, Shores and Payne, strongly tends to show that he was shot as he started to get out of the boat upon the wharf. Immediately following the report of the rifle, Ward's exclamation was, "He shot me!" Avery Payne described what he knew of the immediate incident as follows: Speaking of what he and Carson Shores did as the boat reached the hotel dock and what followed, he says:

"He gets to the bow line and I gets the stern line and we tie the boat up. He said, 'Tell Clifton to get up'. I go in and say to Clifton, 'Get up'. Clifton gets up and says, 'Avery, don't ever wake me up like that'. He said, 'My wife does that some times and every time anybody does that I get mad'. He gets up and goes out and comes back in the door and says, 'He shot me', and he falls to the floor, and he falls in this position (indicating) and his head lies between my feet and in less than another minute Lew approaches the cabin door, with a rifle, just like that."

He and Carson Shores then relate some foul and offensive language used by Crockett and describe threats made by him with the rifle which are ample to disclose and establish malice, intent and premeditation to kill the deceased. The language and threats are denied by Crockett.

Crockett pleaded self-defense. He testified that he was afraid of Ward; that Ward had beaten him into unconsciousness in the front of Crockett's home in January, 1946, and that at the time he was beaten earlier that even-

ing by Ward on the Shores' boat he was rendered unconscious for a short period of time. He said that he was required to wait at the wharf or on the boat "Betty Lee", for Mr. Richardson; that he had secured the rifle from the boat of Watts to protect himself; that he had rowed out from the wharf in a skiff to avoid meeting Ward, and just as he returned and got up on the pier preparatory to going home he was trapped on the Urbanna Beach Hotel wharf so that he could not escape from Ward who he said, unknown to him, had just gotten off the boat and on to the wharf. He said Ward exclaimed, "There you are again. I told you if you crossed my path again tonight I would finish you." Crockett further testified that he told Ward not to come any closer, but he, Ward, who had gotten off the Shores' boat on to the pier, continued to approach, whereupon Crockett fired in order to wound Ward. Crockett stated that Ward fell or jumped back into the boat and ran into the cabin; that he was not certain that he had hit him when he shot the one time, and that therefore he went on the boat to see if he had wounded him.

From the verdict the jury evidently disregarded the testimony of the accused as to how the shooting occurred and accepted that of the Commonwealth, which abundantly sustains the verdict.

. This bring us to a consideration of the instructions. The Commonwealth contends that there were no proper or timely objections and exceptions to any instructions which were granted or refused as is required by Rule 22 of this court.

While the record is not skillfully prepared, it appears from Certificate of Exception No. 2 that exceptions were taken to the court's refusal to grant certain instructions offered by the defendant, one of the instructions which was refused being Instruction A, sometimes referred to as Instruction No. 5. It further appears from the opinion of the trial judge which was made a part of the record that counsel did except to the refusal to give such instruction.

The grounds for refusal are recited at length in the judge's opinion.

This loose and inappropriate manner of saving exceptions to the giving or refusing of instructions is disapproved. However, upon careful examination of the record it does appear from the certificate and the opinion of the court that a timely objection was made to the refusal to give this instruction and that the court was apprised of the reason and grounds on which it was sought.

Sixteen instructions were given—ten at the instance of the Commonwealth and six for the accused. The several grades of homicide were defined and explained and instructions given on other pertinent matters such as reasonable doubt and self-defense.

Two of the instructions, Nos. 7 and 9, on behalf of the Commonwealth had to do with whether sufficient time had elapsed for the passion engendered by the attack and beating of the accused by the deceased to have subsided. Instruction No. 7 told the jury that if such were the case but the accused thereafter, with malice and premeditation, killed the deceased then he was guilty of murder in the first degree. Instruction No. 9 further told and advised the jury as to what effect sufficient time for the blood to cool would have upon certain circumstances in evidence.

The accused asked for Instruction A (or 5). It recited facts, supported by testimony which was not incredible, and, if believed, upon which a finding of voluntary manslaughter was sought and could be predicated. If the jury believed the evidence recited, a verdict of manslaughter would be justified. This instruction was refused. It reads, with minor corrections indicated by brackets, as follows:

"The court instructs the jury that should they believe from the evidence that the deceased, Clifton Ward, had made, a few hours previously to the homicide, a violent assault upon the prisoner, and had inflicted a severe wound upon his nose and cheek, which rendered him unconscious for a time, and that before he had fully recovered [from] his mental faculties and was still in the heat of passion and

smarting under the influence of said assault, and when under all the circumstances surrounding him and in view of his condition from being struck the blows on Carson Shore's boat a sufficient time had not intervened for his blood to cool and" reason "to resume [his]" its "sway in allying his resentment, Louis Crockett armed himself with a rifle", for his own protection, "and in taking the skiff back to the hotel pier, he suddenly saw Clifton Ward, who had just arrived at the pier in Carson Shore's boat, and Louis Crockett fired upon Clifton Ward and killed him, the Court instructs the jury that they cannot find him guilty of a higher grade of offense than manslaughter, * * *."

Instruction A is not artfully drawn. Certain parts, including the several lines at the end which are omitted above and so indicated by asterisks and the two words enclosed in brackets, were not justified and should have been deleted as indicated. It does, however, undertake to present the opposite theory to Instruction No. 7. There was credible evidence to support the version presented by this instruction. It does not appear to have been refused because it was not perfect in form. The trial court, in its opinion, concludes that Instruction G, aided by Instruction H, was sufficient to properly present accused's theory of manslaughter to the jury. We are led to believe that Instruction A (5) was refused for that reason by the trial judge. Instructions G and H are as follows:

"G. The Court instructs the jury that if at the time of the homicide the prisoner's state of mind caused by passion, anger, or rage, was such as that a reasonable doubt could exist as to his having acted deliberately and with premeditation they cannot find him guilty of murder in the first degree."

"H. The Court instructs the jury that if they have a reasonable doubt as to the grade of offense of which the prisoner may be guilty, that they shall resolve that doubt in his favor, and find him guilty of the lower grade; to illustrate, if they have reasonable doubt as to whether he is guilty of murder in the first degree or the second degree,

they should find him guilty in the second degree. It they have a reasonable doubt as to whether he is guilty of murder in the second degree or manslaughter, they should find him guilty of manslaughter, and if they have a reasonable doubt as to whether he be guilty at all, they must resolve that doubt in favor of the accused and acquit him."

It may be readily seen that Instruction G does not undertake to make any recital of the evidence on behalf of the accused nor does it deal with manslaughter. It tells the jury what is *not* murder in the first degree. Instruction H makes no recital as to the evidential theory offered by accused. It instructs in regard to a legal presumption enjoyed by the accused as to the grades of homicide. The necessity for Instruction A(5) and the insufficiency of Instructions G and H to supply such necessity clearly appear. Accused was entitled to an instruction giving the evidential matter relied on by him to reduce the crime to the grade justified by his evidence if believed. *Hale* v. *Commonwealth*, 165 Va. 808, 183 S. E. 180, and *Jones* v. *Commonwealth, ante*, p. 133, 45 S. E. (2d) 908.

The jury had been told in Instruction No. 7, which was a finding instruction, what was the effect of the lapse of sufficient time for the passion to subside. It had been told in Instruction No. 9 that if sufficient time for blood to cool had elapsed then any prior beatings of accused by deceased could not avail accused in any particular. The two together had fully and clearly instructed the jury as to the effect of lapse of sufficient time for passion to subside, yet the only instruction which informed the jury as to the law where there had been *insufficient* time was refused.

By Instructions No. 7 and 9, the court rightly recognized that, under the facts in evidence, it was a jury question as to whether sufficient time had elapsed for the blood to cool, and instructed the jury thereon in accordance with the Commonwealth's factual contention. They were told what the effect was if such time had elapsed. But by the refusal of Instruction A, so far as the accused was concerned, the

court denied him the right to have that question considered by the jury upon his factual contention, i. e., that sufficient time under all the circumstances had not elapsed.

Whether or not, under all the facts and circumstances presented, a sufficient time has or has not elapsed to preclude the accused from relying upon an otherwise sufficient provocation to reduce the homicide to manslaughter, is, within reasonable bounds and under proper instruction from the court, a factual matter for determination by a jury. In Warren on Homicide, Vol. 1, p. 453, it is said: "Whether or not there had been a sufficient cooling time is a question for the jury, to be determined in the light of all the attendant circumstances.." And in Vol. 3, sec. 309, pp. 521 and 522, we find: "Whether homicide occurred during the heat of passion is a question for the jury. As a general rule, the question of cooling time is for the jury * * * ." Numerous cases are cited to sustain the text, including *State* v. *Beatty*, 51 W. Va. 232, 41 S. E. 434. See also, Bishop on Criminal Law, Vol. 2, 9th Ed., secs. 711, 712, and 713, pp. 543 and 544; Clark and Marshall, Crimes, 4th Ed., sec. 258, p. 323.

The instruction had credible evidence to support it and presented a theory of the case relied on by the accused. It was vital to a reduction of the presumed crime of murder in the second degree to voluntary manslaughter. His two theories—self-defense and voluntary manslaughter—were not, upon the evidence, inconsistent.

In *Wilkins* v. *Commonwealth*, 176 Va. 580, at p. 583, 11 S. E. (2d) 653, it is said, "A plea of self-defense and of passion, engendered by an unprovoked assault, are not in conflict with each other."

The refusal to give such instruction, in our opinion, constitutes reversible error.

The court refused to permit the witness, Watts, to testify to facts tending to establish that Ward had been actually cheating in the card game on the boat of Shores prior to the attack which Ward made on the accused. Accused contends that this was relevant and if the witness had been

allowed to testify on this point he would have said that Ward was cheating in the game. An argument had arisen between Ward and Crockett due to the latter having indicated that the former was cheating. The misconduct of the deceased in this respect was testified to by the accused and mentioned by Captain Watts in his testimony, but the trial court excluded this part of the testimony of the accused and the witness, Watts.

As the court permitted witnesses for the Commonwealth to testify that the blows inflicted by deceased upon the accused were a result of this charge made by accused against the deceased, it is our opinion that evidence from the accused and Captain Watts as to the truth of the charge should have been allowed. The court permitted witnesses for the Commonwealth to recite accused's objection to the conduct of the deceased in this respect and the deceased's reply and denial of the same and his resentment of such charge, but it excluded evidence offered by the accused to substantiate the truth of his charge. Ordinarily collateral matters of this character are irrelevant, but here the fight, the details of which were admitted in evidence, stemmed from this charge. In such case, when part of the evidence in this respect is permitted to go to the jury, then the entire incident should be detailed. By this denial, the accused was placed in a prejudicial light before the jury.

During the argument of counsel to the jury, the attorney for the accused had asked for sympathy for his client because he was married and had five children, all under the age of eleven years. In the closing argument by the attorney for the Commonwealth, he replied, "When the attorney for the defense asks sympathy for his client due to the fact that he has a wife and five little children you should remember that the deceased, Clifton Ward, left a wife and three little children who are also entitled to your symphathy, as the wife will be deprived of a husband and the children a father for the rest of their lives."

Counsel for the accused objected to the argument of

attorney for the Commonwealth, and the court, in response to the objection, replied, "You did the same thing, Mr. Ambler. Two wrongs do not make a right." Counsel for the accused then replied, "The defense has a right to appeal for sympathy but the Commonwealth has no corresponding right, and I ask the court to instruct the jury to disregard that part of the argument for the Commonwealth." Then the ruling of the court proceeded thus: "Gentlemen of the jury, I instruct you to disregard the arguments of both counsel on that point." Counsel for the accused then excepted.

The attorney for the Commonwealth, without objection from the counsel for the accused, previously had introduced testimony showing that Clifton Ward left two children. Counsel for the accused previously had introduced Mrs. Crockett, the wife of the accused, and she had testified that she and the accused had five children, all under eleven years of age. It is not believed the action of the court in charging the jury to disregard the argument of both counsel on this point could have injured the accused. The jury already knew from the evidence about the children of both Ward and Crockett. We think that the court was in error in its ruling and the remarks of the Commonwealth Attorney should have been stricken out in unmistakable language. *Harrison* v. *Commonwealth*, 183 Va. 394, 32 S. E. (2d) 136. But under the facts of this case we conclude that the incident was harmless. *Parsons* v. *Commonwealth*, 138 Va. 764, at p. 784, 121 S. E. 68. *Dingus* v. *Commonwealth*, 153 Va. 846, 149 S. E. 414.

The court refused to permit the witness R. M. Patterson to testify as to the course a bullet would take through a human body on the ground that it was not shown that he was an expert, an anatomist. This witness had fully explained his qualifications. He testified as to certain measurements on the wharf; the height of the wharf above the water; the height of the wharf above the cockpit of the Betty Lee, and that if a person stood on the wharf and fired a rifle bullet into a person in the cockpit of the boat it

would have been at an angle of 25 to 30 degrees; whereas if a person standing on the wharf had fired at another person standing on the wharf,—the bullet going straight through the person from the place where this bullet entered the body of Ward, the point where it would come out would be from 1½ to 2 inches below the point of entry. He did not undertake to say what the bullet would do in the body,—that is, what course it might take, or what might deflect its course in the body. He was merely testifying as to angles and what or how much downward course would be expected, depending upon where deceased and accused were standing, i. e., their distance apart, and the respective levels on which they might have stood. This testimony had gone to the jury without objection. The coroner had testified as to the course of the bullet through the body of Ward. There was no objection to his testimony. Then the court ruled that it would not allow Patterson to give his testimony on the downward measurement effected from the point of entry to the point of exit through the body.

The evidence discloses two places where the parties may have been standing when the fatal shot was fired. The deceased might have been standing in the cockpit of the boat and accused on the wharf, or both may have been standing, as accused says, on the wharf. He also gave the distance they were apart.

The testimony of the coroner had established the course of the bullet. Some of Patterson's testimony already had been admitted and not stricken. Under those circumstances, the further testimony of Patterson as to the slight downward or almost straight course the bullet would take dependent upon the position of the parties tended to establish that both Ward and accused were upon the wharf and should have been admitted.

After the Commonwealth had rested its case in the late afternoon of October 17, 1946, the sheriff of the county was directed by the court to quarter the jury for the night but the court did not name the place in which

they should be housed. The sheriff, acting on his own counsel, carried the jury to the Urbanna Beach Hotel in the town of Urbanna where the homicide occurred and secured quarters there. This hotel is on a high promontory of land commanding a view of the entire harbor and creek where the various incidents occurred. The accused was not present. In plain view from the hotel, and within varying distances therefrom, were the remains of the pier and hotel wharf, the road from the hotel wharf to Cottage Row where both Crockett and Ward lived, which was traversed by the accused immediately after the homicide, along with Payne and Shores, two important witnesses for the Commonwealth. In addition, there could be seen the place where the boats were tied to the wharf, before and at the time of the killing, and also the course of the creek looking toward Hurley's Wharf and the skating rink.

The jury had heard all of the witnesses in chief for the Commonwealth who had described the various places where the important incidents occurred. It had inspected a map of the surroundings which had been introduced in evidence, and the various points had been identified thereon. One juror admitted he identified the pier to which the Shores boat and skiff were tied from the map which had been introduced as an exhibit. Members of the jury walked down near the wharf where the homicide occurred. There had been material changes in the physical conditions— no boats were tied to the wharf and the wharf had been partly torn down—but there remained the piling and the stringers on it. The jury were there in the morning, while the homicide occurred about 10:30 at night. On the night of the homicide the harbor was filled with small boats, while on the morning in question there were no boats, except perhaps one. The Urbanna Beach Hotel was practically in the center of the scene where the tragedy and the events leading up to and following it took place.

Code, section 6013 (Michie), provides for views by juries in both civil and criminal cases. Under that section the jury may view the premises or place in question, or any

property. The view is granted or withheld within the sound discretion of the court.

Code, section 4894, provides that the accused in a felony case must be personally present during the trial.

In *Noell* v. *Commonwealth*, 135 Va. 600, 115 S. E. 679, 30 A. L. R. 1345, it is held that the prisoner always has the right to accompany the jury on a view. It is there held that a view is a part of the trial and the record must affirmatively show that the accused was personally present throughout the trial which includes the view. His presence at the view cannot be waived by him.

See also, *Pierce* v. *Commonwealth*, 135 Va. 635, 115 S. E. 686, 28 A. L. R. 864, and *Fetters* v. *Commonwealth*, 135 Va. 501, 115 S. E. 692. Annotations in 30 A. L. R., beginning at page 1357; 90 A. L. R. 597; 14 Am. Jur., Criminal Law, sec. 196, and 23 C. J. S., Criminal Law, section 986.

In *Commonwealth* v. *Brown*, 90 Va. 671, 19 S. E. 447, the court held that a mere casual visit to the scene of the homicide by a jury during recess while taking a walk under the custody of the officer in charge in the prisoner's absence was not grounds for setting aside the verdict inasmuch as there was no proof of prejudice, or of any conversation regarding the scene, or of any influence the view had on the jury. That case was somewhat like the case at bar. The action was unauthorized but the court held in that case that it did not constitute reversible error. It partially predicated its finding on the fact that there was no conflict of evidence in the case. At page 677, it is said:

"* * * nor, for aught that is shown by the record, was there any conflict of evidence upon any point in the case. How, then, it was possible for the accused to have been prejudiced by the action of the jury, it is not easy to see."

Here the jury did not go upon the immediate premises where the tragedy was enacted, and they denied any purpose or intent to view the scene of the killing. From the opinion of the trial judge, it appears that he concluded, from a factual standpoint, that there had been no "view

(of) the premises or place in question" within the contemplation of section 6013 of the Code of Virginia, and that there had been such material changes in the scene presented and the conditions obtaining that the action of the jury did not and could not constitute a part of the trial. What took place, he decided, was not factually a part of the trial. Having reached those factual findings, he was of the opinion that the right of the accused to be present at all stages of the trial had not been violated. He further stated that from what the jury did or could observe no deductions could have been drawn "of probative value to the prejudice of the accused."

With the last conclusion we cannot agree. To say that no jurors received any impressions or could make any deductions from what lay before them is to say that normal men do not use or exercise their sense of sight. We certainly cannot assume that they closed their eyes. If it be assumed that only a part but not all of the jurors looked at the surroundings in and about where the homicide was committed, and another part did not look, this would have afforded those who looked an opportunity to get impressions which the others did not get. In any event, the jury was at or near the scene of the killing. For one whole day they had heard these various points in Urbanna referred to and described in evidence. With this information it would have been most natural for them or some of them to have looked over the scene and to have compared what they saw with what they had heard in the testimony.

It makes no difference so far as the accused is concerned whether what transpired was authorized or unauthorized. No one knows what effect it had upon the minds of the jurors or what impressions they got, if any. No one knows whether their impressions accorded with the evidence they had heard in the court room or conflicted therewith.

No courts have been more jealous in protecting the fundamental rights of an accused than those in Virginia. In justice to the accused and in the interest of fairness, it

was improper for the sheriff to have taken the jury to the Urbanna Beach Hotel. It is true the jurors, except Juror Healey, stated they did not go in the direction of the wharf for the purpose of looking upon what was left of the scene of the crime, but they did not say they had not done so. Their purpose was immaterial. Juror Healey said he saw the old piling and stringers on the wharf which he located from his memory of the plat that had been introduced in evidence the day before. The fact remains that the jurors were in position to have looked upon almost the entire locale from the hotel, and they walked in the direction of the pier where they were bound to have seen the approximate spot where the homicide was committed. If it is assumed that they were together, and if Healey could have seen the pier or what remained of it, there is no reason to believe that the others failed to see it. If the court had directed the sheriff to take the jurors for a view in the presence of the accused, he likely would have taken them to the Urbanna Beach Hotel and to or near the same spot where they were when they walked near the pier.

We need not and do not decide that the facts in evidence incident to the quartering of the jury and the observations that any of its members made, or could have made, constitute such factual or official view of the premises or place in question as is contemplated by section 6013, so as to be in and of itself a part of the trial, rendering it necessary that the accused be present. However, it cannot be denied that the entire panorama that lay before the jury constituted a material and inseparable part of the immediate area upon which was enacted the shifting and moving events of the evening of the homicide. It would be difficult to conceive of a crime where the entire locale played a more important part in disclosing the intent and purpose of the movements of accused and deceased just before and at the time of the homicide.

The quartering of the jury by the officers who had them in charge at the Urbanna Beach Hotel, overlooking

the scene of the tragedy, was wholly innocent in purpose. The jury's walking down to the vicinity where the homicide occurred was likewise with innocent intent and may have been without purpose to see the objects and matters about which testimony had been given; but where the entire area before them was of such vital importance, we cannot say that impressions the jury could have so obtained may not have been harmful to the accused. Though no wrongful action was intended by either officer or jurors, the happening casts a shadow of such magnitude over that part of the proceedings as to constitute such misconduct on their part as to impose upon the Commonwealth the burden of disproving any harmful result to the accused. That such proof, under the circumstances here presented, is difficult if not well-nigh impossible, does not render less imperative the necessity of its production. That burden was not sufficiently carried by the Commonwealth.

In *Hickerson* v. *Burner*, 186 Va. 66, at p. 71, 41 S. E. (2d) 451, it is said:

"In *Litz* v. *Harman*, 151 Va. 363, 144 S. E. 477, this court considered the matter of granting a new trial because of the conduct of a juror in inspecting the scene of an automobile collision without the knowledge or permission of the trial court. We quoted 'with approval (151 Va., at page 373), the general rule as stated in 20 R. C. L., sec. 43, p. 260, that such conduct of a juror 'while improper, is not ground for a new trial unless it appears that the verdict was affected thereby'. See also, 39 Am. Jur., New Trial, sec. 78, pp. 91, 92.

"We there said that *whether a new trial should be granted depended upon the circumstances of the particular case;* that, 'Much should be left to the trial judge, and unless he abuses his discretion, his judgment should conclude the matter on appeal'. (151 Va., at page 375.)

"We adhere to that view, with the added caution that only slight evidence of influence or prejudice as a result of such misconduct of a juror should be required to warrant the granting of a new trial." (Italics supplied.)

We also find ample recognition of the fact that the mere locale of an event may be of controlling importance in this respect. This recognition is stated in 39 Am. Jur., New Trial, sec. 78, p. 92, as follows:

"Generally a new trial will not be granted where the unauthorized view is casual, incidental, and not reasonably calculated to influence a jury in arriving at a verdict, and this rule applies in criminal prosecutions as well as in civil actions. Where, however, the gist of the action is the character or condition of the *locus in quo*, or where a better view of it will enable the jurors better to determine the credibility of witnesses and other disputed facts, or where the mere fact of an inspection, in view of the nature of the suit, is calculated to influence the jury to the prejudice of the unsuccessful party, it will be presumed that the knowledge so obtained was in fact prejudicial, and in the absence of evidence to the contrary, a new trial will be granted."

And at page 93, sec. 79, 39 Am. Jur., we find: "It is always improper for a juror to discuss a cause which he is trying as a juror or to receive any information about it except in open court and in the manner provided by law, and it is well settled that the reception of any evidence by the jury, particularly in a criminal case, outside of that produced at the trial, is ground for setting aside the verdict and granting a new trial whenever there is sufficient ground to suspect that one of the parties, in the case of a civil suit, or the accused, in a criminal case, has been prejudiced thereby."

Counsel for the accused upon learning that the jury had been quartered at the Urbanna Beach Hotel which overlooked the scene of this homicide immediately brought the matter to the attention of the court. The jury had then retired or was about to retire to consider its verdict. Counsel awaited the return of the verdict before actually making a motion for a new trial. Motion for a mistrial should have been promptly made when counsel was advised of these circumstances. When a party

has full knowledge of circumstances justifying a mistrial delay in making the motion should not be indulged in. In other words, a party litigant should not await the return of the verdict and have a chance of securing a favorable one, and then, if unfavorable, make a motion for a new trial. When such delay is indulged in, it is usually considered a waiver of his rights. *Jones* v. *Martinsville*, 111 Va. 103, 68 S. E. 265, Ann. Cas. 1912A, 222. However, here it does not appear that full knowledge of all the circumstances was in the possession of counsel for the accused when the jury retired to consider their verdict. What the jury had done and what they had seen or might have seen when they walked down the hill toward the place where the homicide occurred could only have been fully ascertained by questioning the jury. As they had retired before full knowledge of the incident was known to the accused and his counsel, it would not have been advisable to recall them to the court room and make this investigation. Therefore, under the peculiar circumstances of this case, we do not consider that counsel for the accused waived his rights in the premises.

We are of opinion that the facts and circumstances in and of themselves present sufficient evidence of probable influence or prejudice to demand a retrial of the accused free from such conditions and their probable effect.

For the foregoing reasons, the judgment is reversed and a new trial awarded.

*Reversed and remanded.*

BUCHANAN, J., with whom EGGLESTON and SPRATLEY, JJ., agree, dissenting.

The evidence in this case, as I view it, clearly establishes a deliberate and premeditated murder, prompted solely by a desire for vengeance. I do not think the verdict of the jury and the judgment of the court should be overturned for the reasons given in the majority opinion.

It is held that it was error to refuse defendant's instruction A. We should test the correctness of that ruling by the instruction as offered, not as it may now be modified. As offered, it did not say anything about Crockett's arming himself "for his own protection." As offered, it would have told the jury that if Crockett, while still in the heat of passion, and when a sufficient time had not intervened for his blood to cool,

> "armed himself with a rifle and in taking the skiff back to the hotel pier, he suddenly saw Clifton Ward, who had just arrived at the pier in Carson Shore's boat, and Louis Crockett fired upon Clifton Ward and killed him, the Court instructs the jury that they cannot find him guilty of a higher grade of offense than manslaughter, even though they may believe from the evidence that the accused, after the assault against him by Ward on the boat, did not have reasonable grounds to believe that he was in imminent danger of death or bodily harm at the hands of the deceased and was not justified in arming himself with a rifle."

Under that instruction, if the jury believed Crockett was mad, and a sufficient time had not elapsed for his blood to cool, *when he armed himself*, then the homicide was manslaughter, no matter what his purpose was in arming himself, no matter how much time elapsed between that and the killing and no matter what his state of mind when he fired the shot.

It was not his state of mind when he armed himself, but his state of mind when he fired the shot, that is important. That was the caution given in *Jacobs* v. *Commonwealth*, 132 Va. 681, 111 S. E. 90, 93, in this language:

" * * * But we must not lose sight of the fact that the effect of the provocation on the defendant's state of mind was the material and decisive question.

" ' * * * And therefore the provocation which extenuates in the case of homicide must be something which the man is conscious of, which he feels and resents at the instant the act which he would extenuate is committed; not what time or accident may afterwards bring to light. * * * .' " (Quoting from Davis' Crim. Law, p. 84).

Again, instructions should be based on the evidence. The evidence for the Commonwealth, by which we are bound, admittedly established first degree murder. Crockett did not claim that he armed himself in passion or that he killed in passion. According to Crockett, it was some three hours after the trouble on the boat when he armed himself, and about an hour later when he fired the shot. He testified that when he came back to the pier the last time he thought Ward had gone home; that when he climbed up on the end of the pier Ward stepped up on the other side, saw him, and said, "There you are again. I told you if you crossed my path again tonight I would finish you." He told Ward not to come any closer, but Ward started toward him and he, Crockett, fired at him, intending only to wound him.

Carson Shores, testifying for the Commonwealth, said that as Ward started to get out of the boat a shot was fired and Ward fell into the boat. Crockett followed immediately, ejected the empty shell and reloaded the rifle. He commanded Shores and Payne to sit down, saying, "I have enough bullets in here to take care of both of you." He refused to let them go to the aid of Ward, saying, "Take your damn hands off him; let him alone;" and looking down at Ward, Crockett said, "Cough that up, you son-of-a-bitch; I told you I would get you." With the rifle he forced them off the boat, and as he did so he said he wanted to put one more bullet in Ben Hurley's heart, then he would be satisfied and die like a man. The testimony of Avery Payne was to the same effect.

If instruction A had properly stated the legal principle at which it was aiming, it still should not have been given because there was no evidence to base it on.

" * * * It must be remembered, however, that provocation

cannot be relied upon to reduce murder in the second degree to manslaughter unless the provocation has so aroused the anger of the assailant as to temporarily affect his reason and self-control. The authorities for this familiar proposition are cited hereafter. In this case the defendant does not claim to have been thus affected. He expressly negatives any such defense by claiming that he shot the deceased because he thought that action necessary to save his mother and himself, and he does not in his testimony rely upon provocation as a defense. When there is room upon the evidence for a difference of opinion, the question whether the alleged provocation sufficiently operated on the mind of the accused to repel the presumption of malice arising from the killing, and thus reduce the grade of the offense, is one for the jury to determine. * * * ." *Jacobs* v. *Commonwealth, supra.*

Instruction No. 7 given for the Commonwealth does not, as I see it, afford any reason for giving instruction A for the accused. Instruction No. 7 dealt with a killing for the sake of vengeance and correctly told the jury that if the accused, on account of the previous assault, killed Ward willfully, with malice and premeditation, he was guilty of first degree murder.

A killing prompted by malice is not manslaughter.

"It is not only necessary in such a case and for such an effect that a reasonable provocation should be received, but it is also necessary that the provocation should have the effect of producing sudden passion under the influence of which alone the offense is committed. It must be a sudden transport of passion, which the law calls *furor brevis.* If a person on receiving the gravest provocation, is unmoved by passion, but wantonly and willfully and wickedly kills his adversary otherwise than in self-defense, he is guilty of murder. * * * ." *Read* v. *Commonwealth,* 22 Gratt. (63 Va.) 924, 938. *Jacobs* v. *Commonwealth, supra.*

Instruction No. 9 for the Commonwealth dealt with disagreements between the parties prior to the day of the killing and merely limited the jury to the consideration of

"only such provocation, if any, as occurred on the day of the homicide." It has heretofore been approved by this court. *Mealy* v. *Commonwealth*, 135 Va. 585, 115 S. E. 528.

Again, it is clearly demonstrated that the absence of instruction A in no wise affected the verdict. Instruction G, given for the defendant, told the jury that if the accused was in such a state of mind, caused by passion, anger or rage, that there was a reasonable doubt whether he acted deliberately and premeditatedly, they could not find him guilty of first degree murder. They found him guilty of first degree murder; that is, they found affirmatively that he was not in a state of passion and anger, but that he killed with malice and premeditation, and the evidence amply supports that conclusion. *Harris* v. *Commonwealth*, 134 Va. 688, 695, 114 S. E. 597.

The majority opinion holds to be ground for reversal what is termed the innocent acts of quartering the jury in the Urbanna Beach Hotel and the jury's walk down to the vicinity where the homicide occurred.

Here, also, we should judge the situation by what the record shows. The motion to set aside the verdict was not based on the jury's being quartered at the Urbanna Beach Hotel or on what they saw there. There is no evidence that they saw anything there that they should not have seen.

The record shows that the only view that was assigned as error was the supposed view that occurred after breakfast on the second morning of the trial. Counsel for accused states in his brief he learned about it at suppertime that night. The record shows that he called it to the attention of the court after the jury had been considering the case for "at least an hour," and did not then state whether he would make a point about it. After the jury returned their verdict the motion was made to set it aside on the ground that the jury had viewed the premises, and the accused called Mr. Richardson and Mr. Patterson as witnesses. They testified that from a distance of five or six

hundred yards they saw the jury come down the hill from the hotel to a point an uncertain distance from the wharf, stay a few minutes and go back.

The court then called the sheriff and his two deputies who were in charge of the jury, and they testified that on that morning one or two of the jurors expressed the desire to take a walk for exercise and fresh air; "that they went down the street leading from Urbanna Beach Hotel towards the Urbanna Creek and when they got within fifty strides from the edge of the creek shore, they turned around and went back to the Urbanna Beach Hotel and got in automobiles and went to the Courthouse in Saluda, Virginia, with the sheriff and his deputies; * * * that they did not discuss the case nor did any member of the jury mention the wharf in their walk towards the Urbanna Creek; * * * that the wharf had been pulled down and there was nothing to be seen of the wharf except a few old piling and stringers which showed where the wharf was located, and that, of course, there were no boats tied to the wharf." The court then "asked all of the jurors before they were discharged from the case if they had viewed or attempted to view the scene of the crime in going in the direction of the place where the wharf was located, and they answered that they did not go in the direction of the wharf for the purpose of viewing the scene of the crime and did not see the wharf, except Mr. Amos Healy who testified that he saw a few of the old piling and stringers which he located as being the place where the wharf was located from the plat made by Mr. R. M. Patterson, which was introduced as evidence in the case."

The point is best answered by the holding of this court in *Brown* v. *Commonwealth*, 90 Va. 671, 19 S. E. 447, in which the opinion was written by Judge Lewis, its then President. There, during a recess of the court, the jury requested the officer in charge of them to be allowed to take a walk; they all walked up to the corner of Queen and James streets; the officer said "that when they got to the corner of the said streets some of the jurors looked into

the alley where the alleged murder was committed, and looked at the premises; that as soon as he came up he asked them to come out of the lane, and that they did so. He said further that they looked at the premises not more than a minute or two, and that no one spoke to them during their walk or at the premises." (90 Va. 673).

In overruling the motion to set aside the verdict for that happening, the court said: "The case is very similar to the well considered case of *State* v. *Brown*, 64 Mo. 367, in which case the facts were these: The jury during the trial went on, and looked at, the ground where the deceased was killed; but the witness could not state that they were looking at the ground with a view of understanding how the killing was done, nor was it shown that they said anything about it, or that they conversed among themselves in regard to the ground. The Supreme Court of Missouri held that this was not misconduct on the part of the jury, and added: 'If, on such grounds as are here relied upon, a verdict must be set aside, then, when the offence is charged to have been committed at a county seat, generally a small village, over the whole extent of which one has a view from the court-house window, and in which not unfrequently the crimes for which persons are prosecuted are committed, the jury would have to be consigned to a dungeon to consider of their verdict, lest they might accidentally see some locality mentioned in the testimony. The place where the killing occurred in this case was not in doubt. There was no conflict of evidence on that subject; no question whether any witness who testified was in a position to see what he related, and no possibility that the defendant could have been prejudiced by the conduct of the jury.'

"Wharton lays it down that a mere casual visit by the jury to the scene of the *res gestae*, and without influence on the jury, as where the jury, when taking exercise under the custody of an officer, walk by such scene, is no ground for setting aside a verdict; and the proposition is fully sup-

ported by authority. Whart. Crim. Pl. & Pr. (9th Ed.), sec. 834." (90 Va. 674).

So, in this case, not only was there no evidence of what the jury saw from the Urbanna Beach Hotel, but if they had seen all there was to see they would have seen nothing that could have affected their weighing of the evidence. There was no conflict in that evidence on any point that their looking would have had any bearing on. The killing was not denied. The issue was whether it was murder or self-defense. To see the places where the parties lived, or where they walked, or the water on which the boats had been, could not aid or obstruct the jury in deciding those questions. The only objects that could have been material were the wharf and the Shores boat, and they were not there when the looking was done. The careful and conscientious judge of the trial court, after hearing the evidence on the motion, and being perfectly familiar with the scene, wrote in his opinion that the jury "did not and could not view the scene where the crime is alleged to have been committed for the reason as aforesaid stated, that all of the wharf had been pulled down except a few old piling and stringers and the boat was not at the wharf or was it seen. Therefore, there was nothing that the jury saw or could have seen that would or could have influenced them in their verdict." He overruled the motion for a new trial because, as he said, no possible prejudice could have resulted to the accused. I think we should do likewise.

I do not understand the majority opinion to hold that the exclusion of the evidence of Watts and Patterson was alone of sufficient moment to require reversal. The rejected testimony of Watts was on a collateral matter, and the jury would hardly need the expert testimony offered by Patterson that a bullet fired from a higher elevation will range downward more than one from a lower elevation.